Matter of the Petition of and by PETER J. NOR-
TON for a Visitation of and by a Justice of the
Supreme Court of the SPRINGFIELD, L. I., CEMETERY
SOCIETY.

(Supreme Court, Kings Special Term, October, 1916.)

Membership Corporations Law, § 16 — power of visitation — misappli-
cation or misuse of charitable funds — cemetery corporations —
examination of witnesses — rights of certificate owners deter-
mined.

While a court of equity never had any power of visitation,
yet when a question arose in a proper form as to the use of
funds devoted to charitable purposes equity always assumed
jurisdiction to determine the question.

In this state there is no general power of visitation in the
Supreme Court and resort to the common law would be neces-
sary to determine the intent of any such power conferred by
statute, and whatever it might be it would not include the regu-
lation and control of the finances of an institution or the power
to direct their application.

Unless otherwise provided, the misapplication or misuse of
charitable funds must be determined in a court of equity or at
law in a proper case.

The power of visitation vested in the Supreme Court by
section 16 of the Membership Corporations Law and other
statutes where the word "visitation" is used confers no power
to do anything other than as specifically stated in said section.

Under said section 16 of the Membership Corporations Law
the Supreme Court has power to make an order requiring an
inventory and account of the property, effects and liabilities of
a cemetery corporation, with a detailed statement of its trans-
actions during the twelve months next preceding the granting
of said order.

The court also under its "visitation" power may appoint a
referee to take and state the account, determine the annual
income of the corporation, the amount of its property, whether
any has been misappropriated or diverted and whether the cor-
poration has exceeded its charter powers; but the court can

19

Supreme Court, October, 1916. [Vol. 97.

neither order money to be paid back nor give any direction for the future, disobedience of which can be punished as for a contempt.

The referee appointed to take and state the account has power to examine the officers of the corporation and witnesses as to the misappropriation or diversion of corporate funds alleged to have been taken by the officers for salaries and services.

Where with the exception of such moneys the application made of the funds of the corporation sufficiently appears without the examination of witnesses the report of the referee will be confirmed without direction and the petitioner for a visitation of and by a justice of the Supreme Court will be left to his remedy in equity where all the facts can be brought out and the officers of the corporation and witnesses can be examined and the rights of the certificate holders definitely determined and secured.

APPLICATION for a visitation of and by a justice of the Supreme Court under section 16 of the Membership Corporations Law.

Coombs & Wilson (Robert H. Wilson, of counsel), for petitioner.

Briesen & Schrenk (Daniel D. Walton, of counsel), for Springfield, L. I., Cemetery Society et al., respondents.

Williams, Folsom & Strouse, for Gilleran, respondent.

CRANE, J. In passing upon this matter I now have the exquisite satisfaction of reviewing myself. On the application for the appointment of a referee to take the accounts of this cemetery corporation under section 16 of the Membership Corporations Law I wrote a brief memorandum which I now must modify as follows:

The Springfield, L. I., Cemetery Society was organized March 24, 1908. At that time Gilleran and Jaffe were the owners of the real estate subsequently transferred to the society for cemetery purposes. On May 22, 1908, the society passed the following resolution:

" On motion duly made, seconded and carried, the society was authorized to purchase from Thomas Gilleran and Moses Jaffe, the premises in Springfield, L. I. consisting of 112.772 acres, described in a deed made by said parties to the Society and executed this day, subject to five mortgages aggregating $196,040, and on motion duly made, seconded and carried, the Society was authorized to issue for the balance of the purchase price of said property certificates of indebtedness according to law to the amount of $3,200,000.00, Three million, two hundred thousand dollars, to be issued as follows: One half thereof to Thomas E. Colby, one quarter thereof to Moses Jaffe and one quarter thereof to Thomas Gilleran."

On this date the real property was incumbered by five mortgages aggregating $196,040, two of which were held by Thomas E. Colby, one for $108,871.27 and another for $30,168.73. Also at this same time by agreement the said Colby was elected a director and became an officer of the society and received certificates of indebtedness amounting to $1,600,000. A deed to the society of forty-nine acres of this property dated July 15, 1908, recited the mortgages and stated that the grantee assumed and agreed to pay them. Upon the face of these proceedings it would appear that the purchase price was the amount of the five mortgages upon the property aggregating $196,040 and the $3,200,000 represented by certificates of indebtedness. Great confusion regarding this is created by a recital in the certificates thereafter issued in the following language: " The issue, of which this certificate is a part (and being the whole issue), shall not exceed the amount of $3,200,000 which is the entire amount of the purchase price of said land."

And also on the 22d day of May, 1908, the by-laws,

adopted by the society at the same time that Colby became a director and officer, enacted the following:

" XI. The directors shall set aside from the proceeds of the sales of the use of the lots and plots such sums as they may deem necessary to pay the certificates of indebtedness of this Society and at least one-half of such proceeds to pay the certificates issued for the purchase money of lands."

We therefore have this contradictory situation: by the transaction of purchase it would appear that the Colby mortgages and the other three were part of the purchase price; while on the other hand the by-laws and the certificates adopted and issued with his knowledge and consent and acquiescence state that the certificates of indebtedness amounting to $3,200,000 are the whole purchase price.

Whether Colby would be estopped as to strangers purchasing these certificates from claiming his mortgages as part of the purchase price cannot be determined in this proceeding.

At this point article IV of the Membership Corporations Law, being chapter 40 of the Laws of 1909, becomes operative and regulates the disposition of the moneys received by a cemetery corporation from the sale of the use of lots. By section 70 at least one-half of the proceeds of the sales of the use of all lots and plots shall be applied to the payment of the purchase money of the real property acquired by the corporation and the corporation may agree with a person from whom any lands are purchased for a cemetery to pay therefor a specified share not exceeding one-half of the proceeds from all sales of the use of lots and plots of such land, and such shares shall be first applied to the payment of such purchase money.

Beginning with chapter 133 of the Laws of 1847 and as thereafter amended by chapter 122 of the Laws

of 1853 and chapter 163 of the Laws of 1860 and including chapter 559, article 3, of the Laws of 1895, there is no limitation to the proportion of the proceeds derived from the sale of the use of plots which may be applied to the purchase price of the cemetery property. Through all of these laws the expression is, " one-half *at least* of the proceeds of all sales of lots or plots shall be first appropriated to the payment of the purchase money of the lands acquired by the society," or similar language. In case the property is to be paid for not at a flat price, but by giving to the vendor a certain proportion of the amount received from the sale of lots and plots, then in that instance fifty per cent only of the proceeds can be applied to the purchase price. As all the cemetery laws read, it is legal for the association to pay all or any part of the proceeds derived from the sale of lots to the purchase price of the land.

What should be used in the way of money or income for the embellishment and development of the property is left to the judgment of those in control of the cemetery association under the limitations above stated. It might be very bad policy to take all the income and apply it to the purchase price, but I cannot find anything in the law which makes it illegal.

The five mortgages upon the property were the following:

*First.* A $20,000 mortgage originally held by the Riverhead Savings Bank and subsequently assigned to the wife of Thomas E. Colby.

*Second.* The purchase money mortgage of $108,-871.27 originally held by Thomas E. Colby and subsequently assigned to his sister Lily J. Colby.

*Third.* A mortgage for $30,168.73 formerly held by Thomas E. Colby and subsequently assigned to his sister Lily J. Colby.

*Fourth.* A mortgage for $25,000 made to Francis E. Clark, the father-in-law of Colby's daughter, and subsequently assigned to the said Lily J. Colby.

*Fifth.* A mortgage for $12,000 to Rose Gilleran and Rebecca Jaffe.

On the 22d day of May, 1908, the date on which Colby became a member and officer of the Springfield, L. I., Cemetery Society, he entered into a written agreement with the society and Rose Gilleran and Rebecca Jaffe wherein and whereby he agreed to take as payment upon the principal and interest of his $108,871.27 mortgage above mentioned forty-five per cent of the amount received by the cemetery society for the sale of cemetery plots, and at the expiration of the said mortgage to extend the time of payment of the same for a further period of two years. Rose Gilleran and Rebecca Jaffe by the same instrument agreed to take five per cent of the proceeds of such sales upon the payment of their $12,000 mortgage, or, to be exact, they agreed upon receipt of five per cent to release the lien of their mortgage upon the plot sold. The mortgages for $30,168.73 and $25,000 were to be taken care of, within the contemplation of the parties, by a sale of a portion of the premises which had been negotiated upon the 6th day of May, 1908, but which was never consummated.

Reconciling as far as possible the action of the parties interested in this cemetery society, it would appear that it had undertaken as a cemetery corporation to pay fifty per cent of the moneys received for the use of cemetery plots upon the certificates of indebtedness issued for the purchase price, and also forty-five per cent to Colby upon his $108,871.27 mortgage, and five per cent upon the Jaffe-Gilleran mortgage. This used up all the income from the sale of lots and left nothing for the improvement or

embellishment of the property. How money was to be raised for this purpose is intimated or suggested, but no plan, as far as I have been able to ascertain, was adopted consistent with the above action. Three mortgages, as the facts developed, were not paid and remained as liens upon the property to be carried or reduced out of the income, the mortgages for $20,000, $30,168.73 and $25,000. If all the income of the cemetery society was used to pay the certificates of indebtedness, the Colby mortgage and the Jaffe-Gilleran mortgage above referred to, how were these other three mortgages to be taken care of? It is stated and appears to be the fact that the agreement of August 22, 1908, was disregarded by the officers of the society and that fifty per cent of the income from the sale of lots has been applied to the payment of the mortgage indebtedness as part of the purchase price of the cemetery land, and the other fifty per cent has been used in payment of the expenses for improving and carrying on the cemetery. Whether or not this be the exact proportion of the payments, it is a fact that nothing has been paid upon the certificates of indebtedness, but part of the income has been used to pay interest upon and to reduce the mortgage debt.

It is because of the refusal of the officers of this society and their failure to pay fifty per cent upon the certificates of indebtedness that the petitioner seeks relief upon this application. It is his claim that all the income should be applied to the certificates of indebtedness and to the two mortgages referred to in the agreement of May 22, 1908.

The existence of the other three mortgage liens makes this impossible and impracticable, and the fact that no money is left for the improvement and embellishment of the property, even if legal, seems to

be contrary to the spirit and intention of the Ceme-
tery Corporation Law. It may be that persons pur-
chasing plots do so under agreement to maintain
them, or there may be other money available for
improvement purposes, but these facts do not satis-
factorily appear from the papers submitted. My
opinion is that a definite plan should be adopted by
the cemetery society for the handling and dispos-
ing of its finances and for the payment of some
amount regularly upon the certificates of indebted-
ness, but the situation here presented is such that it
is impossible for me to say what I should order to be
done, even if I had the power. Upon a full examina-
tion in equity where all the facts can be brought out
and the officers and witnesses examined the rights of
the certificate holders no doubt could be definitely
determined and properly secured.

And this leads to the determination of the powers
of the Supreme Court under section 16 above referred
to known as the visitorial power. My conclusion is
that there is no general visiting power in the
Supreme Court unless specifically given by statute,
and that then the extent and meaning of the visiting
power is limited by the wording of the statute. By
this I mean that to give the visiting power to the
Supreme Court without specifying more would mean
little or nothing, and that the statute must state what
this visiting power shall be. For instance, chapter
319 of the Laws of 1848, which was an act for the
incorporation of benevolent and charitable societies,
provided in section 8, "All institutions formed under
this act, together with their books and vouchers shall
be subject to the visitation and inspection of the jus-
tices of the supreme court." This gave the Supreme
Court the power, upon application, to examine the
books and vouchers or to take an account, and noth-

ing more. A like provision was carried through the laws until chapter 559 of the Laws of 1895, constituting chapter 43 of the General Laws. Section 16 was then made to read, with a minor change, the same as now. ''All membership corporations * * * with their books and vouchers, shall be subject to the visitation and inspection of a justice of the supreme court.''

The use of the word '' visitation '' gives no power to the Supreme Court to do anything other than as specifically stated in this section, and the things that can be done as specified are the following:

*First.* The court may make an order requiring an inventory and account of the property, effects and liabilities of such corporation with a detailed statement of its transactions during the twelve months next preceding the granting of this order.

*Second.* It may appoint a referee to take the account.

*Third.* It may determine the amount of property held by the corporation.

*Fourth.* Determine its annual income, and

*Fifth.* Whether any of the property has been misappropriated or diverted.

*Sixth.* Determine whether the corporation is exceeding its charter powers.

It will be noted that the court can order nothing to be done and no power is conveyed by the use of the word '' visitation '' to direct anything to be done other than as above stated. It will at once be seen that this statute lacks the force that was evidently intended to be given it, according to the report of the commissioners of statutory revision (January 2, 1895, Membership Corporations Law).

The utmost that the Supreme Court can do under this section 16 and by this so-called visiting power is to examine the books of the corporation and its

accounts and to state by final order whether there has been a misappropriation or misuse of the funds. It cannot order any amount to be paid back, neither can it give any direction for the future which can be punished as a contempt. How far such an order would be binding upon anybody as *res adjudicata* cannot now be determined, and for what purpose an appeal should be taken is difficult to understand.

A statute passed in Wisconsin has gone one step further to give an effectual summary remedy. *Matter of Taylor Orphan Asylum*, 36 Wis. 534. After providing that the Circuit Court is authorized to compel an accounting in the case mentioned, it goes on to say: "And said court shall thereupon proceed in a summary manner, to examine and investigate such accounts, and for the purpose of ascertaining their correctness and of correcting any errors therein, may take the testimony of any person or persons, whose attendance may be required and compelled by the usual process of subpoena and attachment. Said court shall have full power to revise and correct said accounts in all particulars, and to compel any member of said board of directors who may have in his or her possession any moneys or property belonging to said orphan asylum, to pay over and deliver the same to said corporation, and shall make such order in the premises as will fully protect the fund created by said will, and shall enforce the due execution and performance of the trusts thereby declared."

Chancellor Kent in his Commentaries (p.*300), in speaking of the power of visitation over eleemosynary corporations, states that the visitor may amend the by-laws and ordinances of the corporation, remove its officers, correct abuses, and generally superintend the management of the trust. So in the laws of England by the Earl of Halsbury (Vol. 4, pp. 287–289) it is

stated that the power of visitation consists in settling disputes between the members of the corporation, of inspecting and regulating their actions and behavior, and generally to correct all abuses and irregularities in the administration of the charity. Likewise, in Jones Blackstone's Commentaries, section 650, it is said that the visitor has power to inquire into and correct all irregularities, and in the note at page 481 it is stated that the right of visitation is vested in the state and may be exercised by injunction, mandamus, forfeiture, indictment or quo warranto — which of course is no visitation at all according to the common law, but legal and equitable remedies in no way pertaining to visitation. Angell & Ames on Corporations, 10th edition, page 686, also states that the visiting power consists in regulating abuses. But an examination of all the cases which I have been able to find upon this subject and the authorities upon which these text-book writers base their statements shows that the visiting power, as such, never applied to the regulation and control of the finances; that it pertained to the internal management of a charity, the domestic relations such as the appointment to or removal from office, fellowship or position. While a court of equity never had visitorial power, yet it always assumed jurisdiction over the charity and its officers when a question arose as to the proper use and disposition of the funds. The power of visitation, therefore, pertained to the supervision and regulation of the work and purpose of the charity, while the court of equity, not as a visitor but in its inherent power over trusts, assumed jurisdiction to determine whether the funds were being spent in accordance with the trust and purpose of the charity. *Philips* v. *Bury,* 4 Mod. 112; *Attorney-General* v. *Governors of Free Grammar School,* 23 Beav. 350–355; *Attorney-*

*General* v. *Magdalen College,* 10 id. 402; *Attorney-General* v. *Earl of Clarendon,* 17 Ves. Jr. 491; *Attorney-General* v. *Governors of Foundling Hospital,* 2 id. 42; *Daugars* v. *Rivas,* 28 Beav. 233; Shelf. Mort. 21 L. L. (N. S.) 408, 409; *Dartmouth College* v. *Woodward,* 4 Wheat. 517; Waterman Corp. § 351; *Attorney-General* v. *Utica Insurance Co.,* 2 Johns. Ch. 371.

Instances in which the visiting power has been exercised in this country as distinguished from the control by equity over the disposition of funds may be found in the following: *Murdock* v. *Phillips Academy in Andover,* 7 Pick. 303; *Allen* v. *McKean,* 1 Sumn. 277; *Chambers* v. *Baptist Ed. Society,* 1 B. Mon. 215; *Nelson* v. *Caleb Cushing,* 2 Cush. 519.

The conclusion to be formed from a review of these cases is that the court of equity never had any power of visitation, but that when a question arose in a proper form as to the use of funds devoted to charitable purposes it always assumed jurisdiction to determine the question. The power of visitation was a power vested by the founder in an appointed visitor or the trustees or governors of an institution to regulate its internal affairs and to appoint professors, elect scholarships, officers and the like. In this state there is no general power of visitation in the Supreme Court, and if such power were conferred upon the Supreme Court by statute, resort to the common law would be necessary to determine the extent of that power. Whatever it might be, it would not include the regulation and control of the finances of the institution, or the power to direct their application. The misapplication or misuse of charitable funds must be determined in an action brought in a court of equity or at law in a proper case unless otherwise provided by statute.

The power of visitation, therefore, vested in the

Supreme Court by section 16 of the Membership Corporations Law and the other statutes of the state where the word " visitation " is used conveys no power except possibly to examine the accounts, unless the statutes go further and point out the specific things which the court can do.

The referee appointed by this court has taken the account. The application of the moneys is not disputed. In view of the impossibility of carrying out the plan originally intended by the society this court cannot say that there has been a misappropriation of funds because the mortgage indebtedness was paid instead of the certificates of indebtedness. In an equitable action brought by any certificate holder in behalf of himself and others and in which all parties interested appear, the court would have the power, I believe, to regulate the finances of the society and to direct what amount of money, if any, should be paid upon the certificates of indebtedness. It certainly would have the power to direct the repayment to the society of the moneys withdrawn by the officers for salaries and services, as these payments to my mind were illegal. The reason I do not so determine and declare by order in this matter is because the facts regarding these payments and the services rendered do not fully and completely appear, and for the further reason that this determination would not be binding upon the society or the officers and I have no power under section 16 to direct repayment. Another proceeding will be necessary to recover the amount, and such being the case the facts can be more readily ascertained and the remedy applied after a full and complete trial than upon affidavits.

I do not agree with the referee in this matter that upon the accounting he has only power to take and state the account, and not to examine officers and wit-

Surrogate's Court, Onondaga County, October, 1916.   [Vol. 97.

nesses regarding misappropriation or diversion of funds. With the exception of this money, however, taken by the officers for salaries and services, the application made of the funds of the society sufficiently appears without the examination of witnesses. In view of the fact that this court has no power, as above stated, to make any direction the referee's report will be confirmed and the petitioner left to his remedy in equity.

Report confirmed.