Desmond, Ch. J.
Plaintiff sued for a declaratory judgment but the courts below entered a declaratory judgment in favor of defendant State Cemetery Board. The other respondent, that is, defendant Ferncliff Cemetery Association, a nonprofit membership corporation (see Membership Corporations Law, art. IX), intervened but takes no position on this appeal.
The judgment appealed from declares “ that Section 87, subdivision 2 and Section 86-a of the Membership Corporation Law of the State of New York are valid and constitutional insofar as they affect the agreement of the plaintiff, Grove Hill Realty Company with the defendant Ferncliff Cemetery Association, dated November 22, 1910 ”. The 1910 agreement was for the sale and conveyance by plaintiff Grove Hill to defendant Ferncliff of certain lands in Westchester County for cemetery purposes. No purchase price was stated in dollars but as consideration for the conveyance Ferncliff agreed that it would pay Grove Hill “ one-half of the proceeds ” of the former’s sales to the public of burial lots out of the tract. That contract conformed to section 70 of the Membership Corporations Law of 1909 which authorized cemetery corporations to pay, for *406 lands purchased, not more than half the proceeds of sales of burial plots, the residue to be ‘ ‘ applied to the preservation, improvement and embellishment of the cemetery ’ ’. The agreement between Grove Hill and Ferncliff was carried out for many years until defendant, Cemetery Board of the State of New York, notified Ferncliff that, because of the 1949 amendments to section 86-a and subdivision 2 of section 87 of the Membership Corporations Law, it was illegal for Ferncliff to continue the existing scale of payments to Grove Hill. Those amendments ordered every cemetery corporation to set up a permanent maintenance fund of not less than 10% of the gross proceeds of cemetery lot sales and a current maintenance fund of an additional 15% of such proceeds. Another 1949 amendment to section 87 required that, where a contract for sales of lands for cemetery purposes (like this Grove Hill-Ferncliff agreement) called for payment to the contract vendor of part of the proceeds of sales of burial lots, the amounts to go into the current and permanent maintenance funds must first be deducted from such sales proceeds before determining the contract vendor’s share.
As construed by the Cemetery Board, the Attorney-General and both courts below, the 1949 legislation means that Ferncliff, when it sells a burial lot, and establishes a net sales price after selling expenses, must first deduct 15% and 10% for the maintenance funds, and only then, after those subtractions, may it pay Grove Hill 50% of the remaining balance. Result: Grove Hill collects not half of the whole net price of the burial lot, but half of 75% thereof. Grove Hill in this suit for a declaratory judgment argues that the statute should not be so construed, and asserts that, if it is to be read as requiring a reduction of Grove Hill’s proportion of lot sale proceeds, it is unconstitutional as impairing Grove Hill’s contract rights and depriving it of its property without due process of law.
We first discuss the intent and meaning of the 1949 amendments and then pass to the other question, that is, constitutionality. The 1949 changes, we hold, mean just what they say— that, where a vendor is by agreement being paid a share of his vendee’s burial lot sale proceeds, the vendor’s share is to be figured not on the net burial lot price, but on that price reduced by a prior deduction of 25% for the required contributions to *407 the maintenance funds. It is equally clear that the Legislature, in subdivision 2 of section 87, intended the new rule be applied to existing contracts.
Subdivision 2 of section 87 says in simple words that when a corporation has agreed to pay, for lands purchased, not exceeding “ one-half of the proceeds of sales of lots ” it may “ continue to make payments as so agreed ” (that is, one half of lot sale proceeds) provided that “there be first deducted from said proceeds of sales ” the 15% and 10% maintenance fund contributions. As was held below, that means that, after first deducting 25% from and of the net proceeds for maintenance, the corporation may continue to pay one half the net proceeds to the vendor of the land. If that be not the meaning, the phrase ‘ ‘ first deducted ” means nothing. The only doubt would be as to the meaning of the word1 ‘ proceeds ’ ’ but plaintiff itself has resolved for us any such doubt since it admits that the phrase “ gross proceeds ” in its contract and the word “ proceeds ” in the old and new statutes mean net proceeds after sale expense — in other words, not lot sale price but the amount the cemetery corporation actually gets net after deductions (so held in Reese v. Pinelawn Cemetery, 243 App. Div. 165, and Jackson v. Elmont Cemetery, 300 N. Y. 526). But that word “ proceeds ” must mean the same thing in the part of the new statute which requires that plaintiff’s right to one half the “ proceeds ” (that is, half of the net) is to be paid only after first deducting the two maintenance fund contributions. Unless the word “ proceeds ” is to be given several different meanings, the statute means (as almost everyone seems to have interpreted it) that you start with proceeds (after expenses), then deduct 10% and 15%, then pay not more than half the balance to the vendor, leaving the other half of the net with the corporation for purposes listed.
We turn to the constitutional question. Of course, Grove Hill’s rights as to payment are reduced by the amendments, since under the amended statutes Grove Hill is allowed to collect from Ferncliff not half of the net prices of burial lots, but half of 75% of such net prices. It is conceded that the 1910 contract was legal when made since old section 70 of the Membership Corporations Law, in force in 1910, permitted a cemetery corporation to contract with a seller of lands for cemetery use, to *408 pay the seller a percentage, not exceeding one half, of the proceeds of burial lots made from the land. But it does not follow that the 1949 laws are unconstitutional as to Grove Hill. In New York State, historically and in principle, funds derived from the sale of cemetery lots are regarded as dedicated to a public use and held in trust therefor and their disposal is subject to statutory regulation under the State’s police power (see Matter of Norton, 97 Misc. 289; Whittemore v. Woodlawn Cemetery, 71 App. Div. 257; Matter of Lyons Cemetery Assn., 93 App. Div. 19). The New York Legislature has been exercising that power since 1847 and contracts for the sale of lands for development into cemeteries have necessarily been, to some extent, subject to the later possible operation of that power. Indeed, as we shall see, the 1909 statute gave fair warning by its use of the phrase ‘ ‘ not exceeding one-half of the proceeds of all sales ’ ’ that the vendor rights were to a fraction of the net only after any prior charges.
Statutes passed in 1847 (ch. 133) and 1853 (ch. 122) dealt directly with this matter of payment to contract vendors out of the moneys collected by the vendees from burial lot purchasers. The 1847 laws which forbade cemetery corporations being formed except on a nonprofit basis said that such a corporation could agree to pay a fixed price for land and, if it did so agree, it must pay to its transferor not less than 50% of the proceeds of the resale of each cemetery lot until the full purchase price should be paid to the former owner. The 1853 statute authorized an agreement (like the one here litigated) whereby, in consideration of the transfer of land to a cemetery association, the transferor would be paid not an over-all fixed price but a percentage of the prices at which burial lots were sold. The 1853 statute decreed, however, that such percentage could not exceed one half of the burial lot sale proceeds. The 1847 and 1853 enactments were substantially incorporated into section 70, part of Membership Corporations Law of 1909 and, later, became section 87 and continued as such until the 1949 changes.
In 1948, the Attorney-General of New York State began an investigation into the activities of nonprofit cemetery corporations. A year later he made a long report to the Governor in which he pointed out that by law such corporations ‘1 are dedicated to, and holding their properties for, a public use ” but that *409 many of them were actually 1‘ run as lucrative commercial ventures.” Various frauds, deceptions and mismanagements were described in detail. Cemetery grounds had been shamefully neglected while extravagant profits were made by promoters, salesmen and others. In transmitting the Attorney-General’s report to the Legislature in February, 1949, the Governor recaEed that “ for over one hundred years the operation of cemeteries has been recognized as affecting the public interest and of having the status before the law and the courts of quasi-public utilities ” and that “ The policy of the State in controlling their operation has never been questioned.” The Governor reminded the Legislature that a true public trust is involved in the operation of a tax-free cemetery by a supposedly nonprofit membership corporation (which is given the power of eminent domain and other public powers) and that the discovered abuses of such trusts required legislative attention since existing laws had proven ineffective.
The Attorney-General reported that difficulties had arisen because of the use of the land acquisition method whereby the organizers of a cemetery corporation buy, for the corporation, land owned by the promoters themselves and then, by agreement, receive a specified percentage of burial lot sales receipts “ until the last plot is sold.” If this method of payment be not limited by statute, said the report, the receipts of a cemetery corporation may be diverted to the promoters without adequate provision for care and maintenance of the cemetery. One of the Attorney-General’s recommendations (followed by the Legislature in the 1949 amendments) was for mandated maintenance funds to be made up of 15% and 10% priority deductions from burial lot sales moneys. The Legislature adopted a “ Declaration of Policy” (see L. 1949, ch. 533) which spoke of the people’s vital interest in the preservation of cemeteries and of the existing bad practices in the maintenance and operation of cemeteries.
“ It is the settled law of this court that the interdiction of statutes impairing the obligations of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which *410 in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals * * * in other words, that parties by entering into contracts may not estop the legislature from enacting laws intended for the public good. While this power is subject to limitations in certain cases, there is wide discretion on the part of the legislature in determining what is and what is not necessary— a discretion which courts ordinarily will not interfere with ” (Manigault v. Springs, 199 U. S. 473, 480-481). As Chief Justice Hughes wrote in Home Bldg. & Loan Assn. v. Blaisdell (290 U. S. 398, 435): “ Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order.” It is true that the Minnesota statute in the Home Building case was construed by the Supreme Court as modifying “ remedies ” but not destroying contract “ rights ” (see 290 U. S., pp. 428-430). However, many other decisions of the Federal and State courts have strengthened the authority of the States under the police power to affect the obligations of contracts when public interest required it. Direct statutory controls over substantive, existing, contractual rights were upheld as to constitutionality by our court in Matter of People (Tit. & Mtge. Guar. Co.) (264 N. Y. 69), and in Twentieth Century Associates v. Waldman (294 N. Y. 571) and Matter of Schmidt v. Wolf Contr. Co. (295 N. Y. 748).
“ ‘ The question ’ ”, wrote Judge Lehman in the Title & Mortgage opinion (quoting the Home Building opinion, supra), “ ‘ is not whether the legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end ’ ” (264 N. Y., p. 83). Or, as we phrased it in Defiance Milk Prods. Co. v. Du Mond (309 N. Y. 537, 541): “reasonably related and applied to some actual and manifest evil ”.
The situation dealt with in 1949 concerned the operation of a public trust. The “ actual and manifest evil” was found by the Attorney-General and the Legislature. The statute’s requirements for the setting up and prior deductibility of *411 maintenance funds were reasonably related to the discovered evils. Its application to this plaintiff and this contract was not arbitrary or unreasonable since plaintiff w;as on notice in 1910 when it made its contract that the actual size of its 50% share of the proceeds of lot sales would depend on what amounts were first deducted before the ‘ ‘ proceeds ’ ’ became available. Let us recall how the law read in 1910 when this agreement was signed. The Legislature had already taken hold. The 1909 amendment had authorized this kind of contract but only when the transferor’s share was “not exceeding one-half of the proceeds of all sales” of burial lots. The parties here construed “proceeds ” to mean net, not gross, sales prices and it was authoritatively determined in 1934 in Reese v. Pinelawn Cemetery (243 App. Div. 165, supra, followed in Jackson v. Elmont Cemetery, 275 App. Div. 544, affd. 300 N. Y. 526, supra) that a contract promising the vendor one half of the ‘1 gross proceeds ’ ’ was, under the statute, enforcible as to one half of the net amount only which the cemetery corporation received after necessary deductions. Grove Hill must be held to have made its pact accordingly and to have taken its chances that the Legislature which had asserted its right to regulate such agreements might reduce the “proceeds” by giving priority to additional expenditures required in the public interest.
The judgment should be affirmed, with costs.