Jean S. REED, Plaintiff,

v.

KNOLLWOOD PARK CEMETERY,
INC., Defendant,

and

New York State Cemetery Board,
Defendant-Intervenor.

No. 74–C–1395.

United States District Court,
E. D. New York.

Dec. 1, 1977.

Williamson & Schoeman, New York City, for plaintiff; Michael E. Schoeman, New York City, of counsel.

Pryor, Cashman & Sherman, New York City, for defendant; Sanford M. Goldman, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, for

defendant-intervenor; Mark C. Rutzick, Asst. Atty. Gen., New York City, of counsel.

BARTELS, District Judge.

These are cross-motions for summary judgment on stipulated facts in an action to enforce payments due on certificates of indebtedness issued by Knollwood Park Cemetery, Inc. ("Knollwood") and presently held by the plaintiff, Jean S. Reed. Knollwood does not oppose the action; the real opposition is from the intervening defendant, New York State Cemetery Board ("Cemetery Board"), which has prohibited Knollwood from making the payments Reed seeks. Some background is necessary to place the legal issues raised in context.

*Facts*

On April 22, 1947, two promoters, Stannard and Glassir, entered into an agreement with The Evergreens, a cemetery in Queens, to purchase in installments five contiguous parcels of land for sums amounting to almost $800,000. Two days later, Stannard and Glassir offered to convey their purchase rights in the land to Knollwood Park Cemetery, of which they were two of the five directors. Knollwood accepted, agreeing not only to purchase Stannard's and Glassir's rights for $7 million face value in certificates of indebtedness, but also binding itself to satisfy Stannard's and Glassir's obligations on their contract to purchase the land from its original owner, The Evergreens. In effect Knollwood agreed to purchase the land twice.

The certificates of indebtedness issued have a face value of $1,000 apiece, are numbered from one to seven thousand, and are payable in numerical order, as explained on the face of the certificate.[1]

1. The following is printed on the face of the certificates:

THIS IS TO CERTIFY that _____ is entitled to receive from KNOLLWOOD PARK CEMETERY, INC., the sum of One Thousand Dollars out of the land purchase fund of said Cemetery, which fund is composed of 50% percent of the gross proceeds of the sale of land in said Cemetery and of the interest collected by it on the unpaid balance of the sale price of lots.

This Certificate is one of a series of certificates amounting in the aggregate to Seven Million Dollars ($7,000,000) all of like tenor and effect. All of such certificates are a lien on the land purchase fund.

Whenever the land purchase fund shall have accumulated in the treasury of the Cemetery an amount in excess of Ten Thousand Dollars, after setting aside the amount necessary to purchase and pay for any cemetery land which on the 24th day of April, 1947, the Cemetery

In 1947, when Knollwood was incorporated, former § 87 of the Membership Corporations Law [2] required a cemetery corporation to apply at least one-half of the proceeds of lot sales to payment of the purchase price of real estate acquired by the corporation, but prohibited the corporation from agreeing with the seller of the real estate that the seller would receive more than one-half of such proceeds. The remainder of the lot proceeds was to be applied to the preservation, improvement and embellishment of the cemetery.

In 1949, in response to an investigation by the New York State Attorney General into abuses by cemetery corporations, the Membership Corporations Law was significantly amended.[3] In particular, Not-for-Profit Corporation Law § 1401(y) (McKinney 1970) [hereinafter cited as "N–PCL"] required for the first time every cemetery to set up a current maintenance fund and a permanent maintenance trust fund and to deposit 15% and 10%, respectively, of the gross proceeds of lot sales into these funds. In cases where a cemetery corporation had previously agreed with a seller of real estate to pay him a percentage not in excess of 50% of the proceeds of lot sales, the new law required that before determination of the seller's share there first be deducted from the proceeds the amount of the maintenance funds and expenses of lot sales.[4]

Knollwood thereafter did not follow the formula prescribed in the amendments. Instead of first setting aside from gross proceeds the amount of the maintenance funds and the expenses of sales and then taking 50% of the remainder for the land purchase fund, Knollwood first set aside 50% of the gross for the land purchase fund and thereafter made deductions from the balance (the "unrestricted funds") for such maintenance funds and sales expenses. This practice, which Knollwood followed for many years, had the effect of significantly increasing the size of the land purchase fund and decreasing the size of the unrestricted funds.

Adding to these defalcations, Knollwood immediately began in 1947 to make payments on the certificates of indebtedness, and by 1954 it had paid out $138,000, before the full amount due on the original Evergreens contract of April 24, 1947, had been paid or set aside for payment as required by the terms of the certificates. When the Cemetery Board became aware of this default it threatened legal action, but the matter was eventually settled between Knollwood and the Cemetery Board by an agreement which provided:

1. Until the full amount of monies owing to "The Evergreens" under the contract dated April 24, 1947 has been paid or set aside, no further monies will be paid in redemption of certificates beyond the $138,000 already paid out therefor; and

2. Knollwood will procure the consents by the owners of all outstanding certificates that the maximum amount

---

was under contract to purchase, such excess shall be used to pay the Certificates of Indebtedness in their numerical order beginning with No. 1.

KNOLLWOOD PARK CEMETERY, INC., is in nowise indebted to the holder of this Certificate but acts merely as the collector and depository of the land purchase fund herein described, with only such liabilities as pertain to the proper discharge of the trust reposed in it by the holder thereof.

2. N.Y. Laws 1926 c. 722. The Membership Corporations Law was amended in 1949, N.Y. Laws 1949 c. 533, and recodified in 1970, Not-for-Profit Corporation Law § 1401 (McKinney 1970). For the sake of convenience, reference to the law in effect at the time the certificates of indebtedness were issued will be to former Membership Corporations Law, and references to the law as amended will be to the Not-for-Profit Corporation Law.

3. See note 2, supra.

4. N–PCL § 1401(z)(2) (McKinney 1970) states in pertinent part:
 Where a corporation has agreed with a person from whom any such lands were purchased to pay therefor a specified share not exceeding one-half of the proceeds of sales of lots therein or the use thereof, such corporation may continue to make payments as so agreed, provided however that there be first deducted from said proceeds of sales the amount required to be deposited in the permanent maintenance fund and current maintenance fund as aforesaid together with the expenses of sale.

payable for certificates, including the $138,000 already paid, shall be Two Million Four Hundred Fifty [sic] ($2,450,000) Dollars, and the certificates will be reduced accordingly. The said certificates shall be non-interest bearing.

Knollwood accordingly suspended payments on the certificates until 1957, when the Evergreens contract was satisfied by monies taken from the cemetery's unrestricted funds rather than from the land purchase fund. However, there is no written evidence that the consents called for in paragraph two of the settlement agreement were obtained.

Although Knollwood had been filing financial statements with the Cemetery Board on an annual basis, the Cemetery Board did not begin to take a close look at Knollwood's accounting practices until 1967, when Knollwood applied for a rate increase. The Board granted the increase, but it also ordered Knollwood to suspend payments on the certificates of indebtedness pending an investigation. The Board issued a final order on November 24, 1971 (affirmed without opinion by the Appellate Division on February 13, 1973) which directed Knollwood Park Cemetery:

(a) By proper bookkeeping entries to credit the land purchase fund with the 50% of the net proceeds from lot sales collections remaining after deduction of the expenses of sale and the statutory 10% and 15% of the gross proceeds for the Permanent Maintenance and Current Maintenance funds, respectively, for all past collections and for future collections;

(b) By proper bookkeeping entries to charge the land purchase fund the sum of $792,471 heretofore paid to the Evergreen Cemetery;

(c) To continue the suspension of payments to the holders of the certificates of indebtedness until such time as the general fund of the cemetery corporation fully recovers from the land purchase fund the said $792,471;

(d) To obtain the Cemetery Board's approval before resuming payments to certificate holders from any excess proceeds which may accumulate in the land purchase fund after repayment of the $792,471.

Plaintiff is the holder by inheritance from her grandfather Stannard of 88 certificates of indebtedness. If the Cemetery Board's order is proper, she will not be entitled to recover on any of the certificates at the present time; indeed, taking into consideration the $1.3 million in certificates which have already been redeemed, there would be a deficit of over $400,000 in the land purchase fund. If, however, the Cemetery Board is incorrect with respect to either the maintenance fund deductions or the Evergreens contract payments, plaintiff will recover on some of her certificates. If the Board is incorrect with respect to both of these items, there will be sufficient monies in the land purchase fund to permit her to recover on all of her certificates. Plaintiff has no objection to that part of the order directing reaccounting for the expenses of sales.[5]

The Cemetery Board relies on the phraseology of the certificate of indebtedness for its order charging the land purchase fund for the Evergreens payments, and relies on the express language of N–PCL § 1401(z)(2) for its order charging the land purchase fund for 50% of the monies required to be placed in the maintenance funds. Plaintiff contends that (1) the certificates should not be interpreted to require charging the land purchase fund for the Evergreens payments; and (2) in any case the Cemetery Board had no authority under the statute to impose its interpretation of the certificates on the Cemetery. Plaintiff also contends that if N–PCL § 1401(z)(2) requires the

---

**5.** While the certificates define the land purchase fund as 50% of gross proceeds, this was illegal under former § 87 of the Membership Corporations Law, which permitted a cemetery to agree to pay 50% of the "proceeds" of lot sales. However, the word "proceeds" had long been interpreted to mean only "net proceeds." *Reese v. Pinelawn Cemetery,* 243 App.Div. 165, 276 N.Y.S. 381 (1934). *See Jackson v. Elmont Cemetery,* 300 N.Y. 526, 89 N.E.2d 250 (1949).

cemetery to place in the maintenance funds monies which would otherwise increase the land purchase fund, the statute unconstitutionally impairs her contract rights under the contract and due process clauses of the constitution.

### Interpretation of the Certificates

1. *The language of the certificates is clear.*

 The pertinent clause of the certificate states: "Whenever the land purchase fund shall have accumulated . . . an amount in excess of Ten Thousand Dollars, after setting aside the amount necessary to purchase and pay for [the Evergreens land], such excess shall be used to pay the Certificates of Indebtedness . . . ." We believe that the Cemetery Board is correct in its interpretation that the Evergreens monies are to be set aside out of the land purchase fund. Not only is "the amount necessary to purchase and pay for [the Evergreens land]" something which obviously relates to the land purchase fund, but to construe the clause as referring to anything else but the land purchase fund would make no grammatical sense. Plaintiff asserts that the law does not require payments to The Evergreens from the land purchase fund rather than from unrestricted funds, and that the certificates should not be interpreted to impose any greater restriction on the source of funds to pay The Evergreens than the statute did. This argument is based on an unwarranted interpretation of the law [6] and is belied by the clear language of the certificate. While this self-serving construction might accurately reflect the real intent of Stannard and Glassir, the law in New York is clear that a court may not in the guise of interpreting a contract rewrite it to express the real intention of the parties if to do so would contradict the clearly express language of the contract. *Rodolitz v. Neptune Paper Prod-*

*ucts, Inc.,* 22 N.Y.2d 383, 292 N.Y.S.2d 878, 239 N.E.2d 628 (1968); *Peripheral Equipment, Inc. v. Farrington Mfg. Co.,* 29 A.D.2d 11, 285 N.Y.S.2d 99 (1967). *See Morlee Sales Corp. v. Mfrs. Trust Co.,* 9 N.Y.2d 16, 210 N.Y.S.2d 516, 172 N.E.2d 280 (1961).

 Plaintiff further asserts that the interpretation placed on the certificate by Knollwood and by the certificate holders, as evidenced by their conduct over the last eighteen years, and as acquiesced in by the Cemetery Board until 1967,[7] should be controlling, citing a number of authorities.[8] Plaintiff has misconstrued these decisions. The conduct of the parties in the construction of a contract is relevant only when the words interpreted are of doubtful import, which we do not find to be the case here. The intent of the parties is to be found in the language used to express such intent, and if the language is unambiguous, evidence of the parties' actions and intentions is irrelevant. Thus payments made because of an improper construction of the certificate do not alter the meaning of the certificate. *Brainard v. New York Central Railroad Co.,* 242 N.Y. 125, 133–34, 151 N.E. 152, 154 (1926).

2. *Any ambiguities should be construed against plaintiff.*

Even were the court to discern some ambiguity in the language of the certificate, it would still hesitate to adopt plaintiff's interpretation. Considering the background of these transactions, it would be a mockery of justice for this court to attach any weight to the course of conduct engaged in by Knollwood and its certificate holders. This conduct in reality constituted flagrant self-dealing in complete disregard of both the terms of the certificate and of the law, designed to squeeze the Cemetery as quick-

---

**6.** *See* note 9 and accompanying text, *infra.*

**7.** While the Cemetery Board's failure to act on this aspect of the certificates for so long raises questions as to its competence, especially since it scrutinized Knollwood's accounts once before, plaintiff has not alleged that she was prejudiced in any way by the Board's inaction.

**8.** *E. g., Madawick Contracting Co. Inc. v. Travelers Ins. Co.,* 307 N.Y. 111, 120 N.E.2d 520 (1954); *City of New York v. New York City R. Co.,* 193 N.Y. 543, 86 N.E. 565 (1908); *Carthage Tissue Paper Mills v. Village of Carthage,* 200 N.Y. 1, 93 N.E. 60 (1910).

ly as possible of its funds for the benefit of Stannard and Glassir.

■ Moreover, former § 87 of the Membership Corporations Law and present N–PCL § 1401(z)(2) also bar plaintiff's construction. Section 87, in effect when Knollwood issued the certificates, prohibited any agreement with a seller of real estate to a cemetery corporation authorizing the seller to receive more than half the proceeds of lot sales. Knollwood bound itself to pay not only a purchase price of $7,000,000 for the land in certificates of indebtedness to Stannard and Glassir, but also to pay Stannard's and Glassir's obligations of approximately $800,000 on the latters' contract to purchase the same land from The Evergreens. Thus the purchase price paid by Knollwood for the land was increased by the amount of the purchase price owed to The Evergreens by Stannard and Glassir. To permit Knollwood to pay the Evergreens funds out of the unrestricted portion of the lot proceeds while devoting the entire other half of such proceeds to satisfaction of the certificate holders would obviously be an approval of the expenditure of greater than one-half of the lot proceeds for the payment of real estate purchased by the Cemetery.[9] This would be an impermissible construction of the certificate. *Longley v. Coons,* 244 App.Div. 391, 280 N.Y.S. 17, *aff'd,* 268 N.Y. 712, 198 N.E. 571 (1935).

### Authority of the New York State Cemetery Board

■ Plaintiff's argument that the Cemetery Board has no authority to apply its own interpretation of the certificates of indebtedness may be quickly disposed of. Our holding that the plaintiff has no claim to the monies in the land purchase fund which should have been used to pay The Evergreens, would be the same even had the Cemetery Board issued no order at all.

But in fact, the Cemetery Board had ample power to issue the order under N–PCL § 1401(z)(z)(2), which authorizes the Board to order any cemetery corporation to refrain from acting in violation of the statute. Additionally, N–PCL § 1401(z)(2) permits a cemetery corporation with previously outstanding certificates of indebtedness to continue making payments on the certificates "as so agreed," provided it otherwise complies with the statute. Thus, even were Knollwood's payments to The Evergreens not a violation of the statute, such payments were a violation of the certificate and the Cemetery Board could therefore order them to be corrected.

### Impairment of Contractual Rights

Plaintiff urges that N–PCL § 1401(z)(2) unconstitutionally impairs her contract rights under the certificate of indebtedness. Indeed, there is no question that the statute, which diminishes the land purchase fund by approximately 12½%, impairs the contract rights of the certificate holders. The crucial question is, whether such an impairment is constitutional.

■ In *United States Trust Co. of N. Y. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), the Supreme Court recently reaffirmed the principle that a statute impairing the obligation of private contracts is constitutional if that statute serves a legitimate public purpose and sets forth reasonable conditions. The Court there stated that the states must possess broad power to adopt general regulatory measures for the public welfare without being hindered by the impairment, or even destruction, of private contracts. A pertinent example of such legislation is found in *Veix v. Sixth Ward Bld'g & Loan Ass'n of Newark, N. J.,* 310 U.S. 32, 60 S.Ct. 792, 84 L.Ed. 1061 (1940), where the Court upheld a statute limiting the contract rights of

---

**9.** Plaintiff argues that such payments would not be a violation of the statute, quoting a Cemetery Board accountant and *Jackson v. Elmont Cemetery,* 275 App.Div. 544, 90 N.Y.S.2d 521, *aff'd,* 300 N.Y. 526, 89 N.E.2d 250 (1949). The opinion of the Board's accountant upon a question of law does not bind this court, and

*Jackson* does not support plaintiff's claim that liens on acquired lands may be paid from unrestricted funds. Although the cemetery in *Jackson* did make mortgage payments from unrestricted funds, the propriety of such payments was not disputed and was not an issue before the court.

shareholders of loan associations to make withdrawals. The Court observed that the legislation was concerned with loan associations wrecked by unrestricted withdrawals, and that while the legislation was not emergency legislation, it was directed to an evident threat to the banking structure. The contract obligation of the association to permit withdrawals was held subject to the state police power, and the Court found it irrelevant that the legislation, which attempted to correct underlying weaknesses in the system, was permanent in nature. Supporting the same principle is *Union Dry Goods Co. v. Georgia Public Service Corp.,* 248 U.S. 372, 39 S.Ct. 117, 63 L.Ed. 309 (1919), where the Court upheld an order of the Public Service Corporation permitting a utility to charge higher rates than those provided in the contracts with its customers. There the Court said that "capital invested in an electric light and power plant to supply electricity to the inhabitants of a city is devoted to a use in which the public has an interest which justifies rate regulation by a State in the exercise of its police power." *Id.* at 374–75, 39 S.Ct. at 118.

■ It is with these authorities in mind that we must view the constitutionality of the legislation here attacked. The New York Court of Appeals has heretofore held that the predecessor of § 1401(z)(2) is constitutional and our examination of the background of the legislation convinces us that this is correct. *Grove Hill Realty Co. v. Ferncliff Cemetery Ass'n,* 7 N.Y.2d 403, 198 N.Y.S.2d 287, 165 N.E.2d 858 (1960). The *Report of the Attorney General on the Subject of Cemeteries,* 1 N.Y.Legis.Docs., 172d Sess., Legis.Doc. No. 7 (1949), sets forth the context in which the statute was enacted. The *Report* (1) stresses the public nature of the services rendered by cemetery corporations and their status as quasi-public utilities; (2) discloses shocking abuses of funds and neglect of cemetery grounds and warned that "in the foreseeable future, when the corporations have been drained of their last easy dollar, the operators will abandon cemeteries and thrust them back upon municipalities to become public charges," *id.* at 6; and (3) emphasizes the

importance to the public of preserving private cemeteries in New York state from neglect and ruin. Under the circumstances, we conclude that the establishment of maintenance funds required by the statute was a reasonable and necessary means to correct the reported abuses.

■ Plaintiff, echoing the argument of the dissent in *Grove Hill, supra,* asserts that the legislative goals could have been attained without infringing on the rights of the certificate holders by taking the 25% of gross proceeds required to be placed in the maintenance funds solely from the ample unrestricted funds in the cemetery corporation. It is true that in *United States Trust Co., supra,* the Supreme Court stated that a determination of the necessity of a particular modification depended on whether an alternative solution, or a less drastic modification of the contract, would have achieved the legislative goals. Upon this point the Court, however, made a distinction between private and public contracts. It held that where the state's self-interest is in question, as in the case of a modification of public bond obligations, complete deference to the legislative assessment of reasonableness and necessity is inappropriate. On the other hand, the Court stated that where private contract rights are modified, as in this case, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." 431 U.S. at 22–23, 97 S.Ct. at 1518.

■ Here the New York statute requires that the unrestricted funds of a cemetery corporation be applied to the preservation, improvement and embellishment of the cemetery grounds and its approaches. N–PCL § 1401(z). It was obviously the intent of the state legislature that these funds not be diminished by more than approximately 12½% in order to maintain the effective functioning of the cemetery. Even though Knollwood may have ample unrestricted funds, the legislature is entitled to look at the picture as a whole and enact legislation directed to the typical situation, a shocking one of neglect and misappropriation of funds. *Home Bld'g & Loan*

*Ass'n v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). While the question may fall within the borderline area, we believe that we must defer to the legislative judgment as to the reasonableness and necessity of the remedies chosen in this case.

◼ Indeed, the reserved power of the state to modify contractual rights in the exercise of its police power is particularly apparent with respect to contracts involving cemetery funds. As the New York Court of Appeals pointed out in *Grove Hill, supra,* 7 N.Y.2d at 408, 198 N.Y.S.2d at 291, 165 N.E.2d at 861, the amendments to the law here questioned were to a certain extent foreseeable at the time the certificates were issued, since "[i]n New York State, historically and in principle, funds derived from the sale of cemetery lots are regarded as dedicated to a public use and held in trust therefor and their disposal is subject to statutory regulation under the State's police power (see *Matter of Norton,* 97 Misc. 289, 161 N.Y.S. 710; *Whittemore v. Woodlawn Cemetery,* 71 App.Div. 257, 75 N.Y.S. 847; *Matter of Lyons Cemetery Ass'n,* 93 App.Div. 19, 86 N.Y.S. 960)." It is true the diminution of the land purchase fund by approximately 12½% results in a diminution in the security of the certificate holders and in many cases may ultimately prevent any recovery on certificates bearing a high serial number. However, private parties cannot place a stranglehold on the police power of the state by the terms of their contract involving the purchase of cemetery property which is invested with the public interest. See *Manigault v. Springs,* 199 U.S. 473, 26 S.Ct. 127, 50 L.Ed. 274 (1905); *cf. New York v. Gebhardt,* 151 F.2d 802 (2d Cir. 1945) (statute giving state paramount lien for cost of eliminating grade crossings not unconstitutional). We thus hold that N–PCL § 1401(z)(2) does not unconstitutionally impair the contract rights of the Knollwood certificate holders, nor does it deprive plaintiff of due process. *Blaisdell, supra.*

### Conclusion

We find that the order of the Cemetery Board of November 24, 1971, was proper and constitutional in all respects and that plaintiff has no right to recover. Accordingly, her complaint is hereby dismissed.

SO ORDERED.