**WARSCHAUER SICK SUPPORT SOCIETY, Plaintiff,**

v.

**STATE OF NEW YORK, et al., Defendants.**

Civ. A. No. 88–3928.

United States District Court, E.D. New York.

Jan. 17, 1991.

Jacob H. Sperman, pro se for Warschauer Sick Support Soc., Brooklyn, N.Y.

August L. Fietkau, Asst. Atty. Gen., New York City, for defendants.

### REVISED MEMORANDUM AND JUDGMENT OF DISMISSAL

WEINSTEIN, District Judge:

A motion has been made to dismiss a complaint seeking a declaration that key portions of the New York law regulating cemeteries is unconstitutional. For the reasons indicated below, the case must be dismissed.

Warschauer Sick Support Society ("Warschauer") was one of the many fraternal organizations created in New York and elsewhere in the late nineteenth and early twentieth centuries. During that period, many Jewish immigrants formed mutual-aid societies to ease the transition into American life. Known as *Landsmanshaftn* (alternatively spelled *Landsmannshaften* or *Landsmanshaften*), they provided aid to the sick, funds for burial, a place to meet socially and sometimes to worship, money to bring family members to the United States and other social and cultural benefits. *See, e.g.,* M. Weisser, *A Brotherhood of Memory: Jewish Landsmanshaftn in the New World* 13, 22, 163–73, 219–21 (1985) (first of the cemeteries used extensively by these groups was the Washington Cemetery in Brooklyn, established in 1850); W. Mitchell, *Mishpokhe: A Study of New York City Jewish Family Clubs,* 175–76 (1978).

Generally, *Landsmanshaftn* members came from the same *shtetl* (village) or geo-

graphic area. *See* 10 *Encyclopedia Judaica* (Landsmanshaften) 1414 (1978); M. Meltzer, *The Jewish Americans* 84–86 (1982). They were bound together by ties of religion, relatives and mutual friends, joint problems and affectionate regard for each other's well-being. Through self-help they provided some of the welfare "safety-net" now available through the government. Such organized Jewish charity as a community responsibility has long been prevalent. *See, e.g.,* S. Baron, 15 *Social and Religious History of the Jews* 25, 36 (1973).

*Landsmanshaftn* reached their peak in New York in the 1950s, then numbering close to 6,000. Over time, however, as families began to flourish, the immigrants died and their children assimilated into American life, membership in the *Landsmanshaftn* declined. Today, some of these once prosperous organizations are close to insolvency; many have been legally dissolved or have ceased to operate.

Some *Landsmanshaftn* and other organizations provide free burial to those unable to afford it. *See* Hebrew Free Burial Association, 1 *Chesed* 3 (1990, Nissan 5750) (member of the New York Federation of Jewish Philanthropies) (appeal for donation of unused burial plots for the poor). Jews regard dignified burial performed according to traditional ritual as a basic right to be performed for all. *See* 4 *Encyclopedia Judaica* (Burial) 1515 (1978); *Standard Jewish Encyclopedia,* (Burials and Burial Societies) 375 (rev. ed. 1966).

Warschauer purchased large tracts of grave sites at very little cost in anticipation of the burial needs of its members. With declining membership it attempted to divest itself of surplus grave sites by first "donating" them to the Beth David Cemetery, and now by sale at their market value.

New York law requires that before a cemetery plot may be sold on the open market, it must first be offered to the cemetery at the original purchase price plus 4% interest. *See* N.Y. Not–For–Profit Corp. Law § 1513(c). This statutory price constitutes but a small fraction of present market value.

Cemetery Board Directive 202.13 requires a cemetery to give written notice to the Division of Cemeteries and to the Insurance Department's Liquidation Bureau of an offer by a Fraternal Benefit Society to sell back graves to the cemetery. The cemetery cannot repurchase graves without the consent of the State Cemetery Board. Because fraternal societies that provide either funeral or cemetery benefits are subject to regulation by the State Insurance Department, the Cemetery Board may not approve a buy-back of graves unless the Insurance Department consents. After being informed of Warschauer's intentions, the Insurance Department suggested that the organization be liquidated. *See* N.Y.Ins.Law § 7417.

Warschauer, appearing *pro se* through Mr. Sperman, brought this action against the State of New York and others challenging the constitutionality of the applicable state statutes. It asserts that section 1513(c) of the Not–For–Profit Corporation Law is an unconstitutional taking and is applied in a manner inconsistent with the first amendment of the United States Constitution. Warschauer also seeks to enjoin the New York State Insurance Commissioner from commencing liquidation proceedings against it.

The State moved to dismiss the complaint. Defendant's motion was denied with leave to renew. Warschauer was granted permission to proceed *pro se* through Mr. Sperman, but legal representation for Warschauer was directed to be sought by the Clerk of the court from our *pro bono* panel.

After several members of the *pro bono* panel refused to take the case, the court requested a distinguished member of the bar to undertake *pro bono* representation of plaintiff. The attorney was fully capable of representing Warschauer in federal court, in state administrative proceedings or in attempts to obtain corrective legislation. He consulted with Mr. Sperman and determined that he could not represent

Warschauer, given the relief that Mr. Sperman insisted upon.

At a subsequent hearing in this court, Mr. Sperman persisted in his demand that Warschauer be allowed to sell its cemetery plots at market price. He refused to consider an amendment to the statute or forms of judicial or administrative relief, by analogy to the *cy-pres* doctrine, which would allow Warschauer to transfer the graves to the use of an organization that provided free or low cost burial for needy Jews.

The essence of the taking claim is that Section 1513(c) prohibits a plot owner from selling unless the plot is offered first to the cemetery at the original purchase price, plus simple interest at 4%. The statute, it is contended, is confiscatory because the price of the plot as determined by the statute is far below the market price.

Section 1513(c) is part of a complex statutory scheme designed to regulate cemeteries. The statutes are a legislative response to abuse and neglect of cemetery grounds that threatened to "thrust them back upon municipalities to become public charges...." *See Report of Attorney General on the Subject of Cemeteries*, 1 N.Y.Legis.Docs., 172d Sess., Legis.Doc. No. 7 (1949).

■ Cemeteries have been regulated since ancient times. *See* P. Jackson, *The Law of Cadavers and of Burial and Burial Places* 187–94 (2d ed. 1950). Sale and disposition of cemetery property is a matter of strong public concern in New York and is subject to the State's police power. *See, e.g., Grove Hill Realty Co. v. Ferncliff Cemetery Ass'n*, 7 N.Y.2d 403, 408, 165 N.E.2d 858, 862, 198 N.Y.S.2d 287, 292 (1960); *Jewish Center v. Mt. Eden Cemetery Ass'n*, 15 A.D.2d 94, 99, 222 N.Y.S.2d 644, 647 (2d Dep't 1961); *Reed v. Knollwood Park Cemetery Inc.*, 441 F.Supp. 1144, 1151 (E.D.N.Y.1977).

Courts have long recognized the right of a state to enact laws reasonably related to its police power, even though such laws may interfere with the contractual relations and commercial freedoms of private parties. *See, e.g., Home Building & Loan v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). Statutes that interfere with the sale or disposition of cemetery property have been upheld by the New York Court of Appeals as a reasonable exercise of the police power. *See, e.g., Grove Hill Realty Co.*, 7 N.Y.2d at 408, 165 N.E.2d at 862, 198 N.Y.S.2d at 292 (upholding constitutionality of section that requires certain percentage from sale of plots deposited into maintenance funds); *Jackson v. Elmont Cemetery Inc.*, 300 N.Y. 526, 528, 89 N.E.2d 250, 251 (1949) (upholding validity of section that limits percentage of proceeds that can be paid to vendors of cemetery land).

■ Section 1513(c) is a valid exercise of the State's police power. The legislature could rationally have believed it necessary to prevent the commercial exploitation of cemetery plots intended to be devoted to eleemosynary purposes. It is sufficient that the method chosen was reasonable. *See Williamson v. Lee Optical Co.*, 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955).

Price limitations may ensure that surviving or controlling members of a fraternal society do not use the proceeds from plot sales for their private benefit and do not sell-off grave sites before the burial needs of all possible recipients have been satisfied. By eliminating excessive profits the chance of fiduciary abuse is reduced. The fact that in an individual case such a statute operates in a burdensome manner against persons acting in good faith is not grounds for its invalidation. *See City of New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).

■ The claim that Section 1513(c) is inconsistent with the first amendment is without merit. The statute is facially neutral. As applied, the statute may impact Jewish fraternal organizations disproportionately, but any lack of proportion does not result from a discriminatory motive. It occurs, if at all, because Jewish immigrants were the ones who primarily formed benevolent societies and purchased cemetery plots. Other ethnic groups, for example,

308

paid small weekly premiums for burial policies or took up ad hoc collections after an individual's death. Catholics at one time were required by the Church to be buried in cemeteries belonging to the Archdiocese.

Fraternal Benefit Societies are subject to liquidation proceedings by the State Insurance Department. *See* N.Y.Ins.Law § 4522. The Superintendent of Insurance may seek a judicial order of liquidation of any financially insolvent or impaired entity. *See* N.Y.Ins.Law § 7417. An order of liquidation can be obtained only on court approval after a full hearing. If the proposed liquidation is involuntary, the entity has a right to raise defenses and introduce evidence to establish solvency. *Id.* There are no grounds shown for a federal court to interfere with a possible State instituted liquidation proceeding.

Section 1513(c) cannot be invalidated in order to allow Warschauer to sell its plots for their market value. Warschauer's complaint is dismissed with prejudice.

The state shall provide a copy of the transcript of the hearing to Mr. Sperman. The clerk shall send copies of this memorandum and judgment to plaintiff and defendant and notify plaintiff of its right to appeal.

So ordered.