## MANIGAULT v. SPRINGS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF SOUTH CAROLINA.

No. 46. Submitted November 2, 1905.—Decided December 4, 1905.

In the absence of legislation by Congress, a State has full power to improve its lands and promote the general health by authorizing dams across interior streams, although previously navigable to the sea.

Nothing in the existing constitution of South Carolina interferes with the common-law powers of the State over its navigable waters.

The interdiction of statutes impairing the obligation of contracts does not prevent a State from properly exercising its police powers for the public good notwithstanding contracts previously entered into between individuals may be affected.

While the police power of a State is subject to limitations there is a wide discretion as to its exercise in the legislature, with whose determination as to what is and what is not necessary the courts ordinarily will not interfere.

Except where property is taken for which compensation must be made, private interests are subservient to the exercise of the police power and must give way to general schemes for the public health.

Courts may take judicial notice that the public health is greatly affected by the existence of swamp lands and the reclamation of such lands is a proper exercise of the police powers.

Where there is a practical destruction, or material impairment of value, of lands by overflowing them as the result of construction of dams, there is a taking within the meaning of the Federal Constitution which demands compensation, but otherwise when the owner is merely put, as in this case, to additional expense in warding off the consequences of the overflow.

A court of equity is not bound to enjoin a public work authorized by statute, until compensation is paid where no property is directly appropriated, especially where it is difficult to ascertain the damage, if any, and the statute contains reasonable provisions for compensation.

Although a river may; for purposes of transit and travel, be a highway, in the prohibition in the constitution of South Carolina against special legislation in regard to highways, that word is used in its ordinary sense and the prohibition is inapplicable to water highways.

A general law enacted by a legislature may be repealed, amended or disregarded by a subsequent legislature, and a special act is not necessarily invalid because the legislature dispensed with certain formalities required by a general law in regard to the passage of such act.

THIS was a bill in equity filed March 4, 1903, by Manigault

to enjoin the damming or otherwise obstructing Kinloch Creek, in the county of Georgetown, South Carolina. A demurrer to the bill was sustained, and the bill subsequently dismissed. See 123 Fed. Rep. 708.

It seems that, in 1898, the plaintiff and the two defendants, Springs and Lachicotte, together with one Ford, were adjoining riparian owners on the Santee River, at the mouth of Kinloch Creek. The creek furnished access as a highway to all the proprietors on its banks. At that time the defendants constructed a dam across the creek for their own purposes. Objection was made to this by plaintiff and by Ford as an interference with their rights of passage and irrigation. Plaintiff also complained that the effect was to compel him to raise the dikes around his lands. As a result of long negotiations, a compromise was effected and a contract entered into in August, 1898, between defendants under the name of S. M. Ward & Company of the first part and plaintiff and Ford of the second part, whereby it was agreed that the obstructions should continue until December 31 of that year, when they should be removed, so as to give the parties complaining a clear passage through the creek.

This removal was effected and matters allowed to remain as they were until 1903, when the General Assembly of the State passed an act, reciting the necessity of draining the low lands on the Santee River, whereby their taxable value would be greatly enhanced. Authority was given to the defendants by name to erect and maintain a dam across Kinloch Creek, with a proviso that they should be liable for all such damages as might be established in any court of competent jurisdiction by any landowner claiming that his land had been damaged by reason of the erection of the dam.

*Mr. Henry A. M. Smith* for appellant:

There was a contract. It was under seal and contained mutual concessions and covenants. *Storm* v. *United States,* 94 U. S. 76; *Park Bros.* v. *Kelly,* 49 Fed. Rep. 625.

The statute impairs the contract. *Oregon &c. Co.* v. *Winsor,* 20 Wall. 64; *Hulse* v. *Bonsach Machine Co.,* 65 Fed. Rep. 864.

The statute is not a valid exercise of the police power. It is a franchise grant. This court has not as yet attempted to define the police power. *Jacobson* v. *Massachusetts,* 197 U. S. 11. It must, however, have some relation to the public good or health. *Re Jacobs,* 98 N. Y. 98, 110; *Lawton* v. *Steele,* 152 U. S. 133; *Mugler* v. *Kansas,* 123 U. S. 661.

This statute is not a measure intended for the public health, safety, or morals. Under the police power the State may destroy obnoxious or pernicious property or substances, but it cannot appropriate them for public use. It is prohibitive, not constructive, as applied to the use of individual property or the regulation of individual pursuits. It can destroy diseased cattle, or impure foods, or liquor, or obscene pictures, or any article adjudged to be obnoxious to the public health, morals or safety—but it cannot appropriate and use them for public or private purposes, save under the exercise of the power of eminent domain and after due compensation. *Leovy* v. *United States,* 177 U. S. 621, is not applicable.

The State may take this property under its power of eminent domain but it must compensate the owner. The distinction between the two powers is clear.

Under the police power, the State can regulate the use but not destroy the existence of private property, except where that property is in itself positively pernicious to the public welfare, and its existence forbidden by law, in which case the individual is not entitled to receive compensation for the damage incidental to such regulation.

Under the power of eminent domain, the State can appropriate private property for public purposes, but only on condition of full compensation to the party whose property is appropriated. Const. South Carolina, art. I, § 17.

As to navigable rivers in South Carolina see Const., Art. I, §§ 28, 29; Code of Laws, 1902, tit. X, ch. XXVIII, § 1335; *McCullough* v. *Wall,* 4 Rich. 68; *Shands* v. *Triplett,* 5 Rich.

Eq. 78. As to the value of riparian rights see *Yates* v. *Milwaukee,* 10 Wall. 497; *Weber* v. *Harbor Commissioners,* 18 Wall. 57; *Steamboat Co.* v. *Steamboat Co.,* 109 U. S. 682; *Illinois Central* v. *Illinois,* 146 U. S. 445.

The rules laid down in these cases are not affected by *Shively* v. *Bowlby,* 152 U. S. 1; *Gibson* v. *United States,* 166 U. S. 269; *Scranton* v. *Wheeler,* 179 U. S. 141.

Although the rights of a riparian proprietor are not absolute, but subject to a servitude, viz., the right of the dominant sovereignty, state or Federal, to improve navigation. In all other respects his rights, when once vested, are the same as those of any other landowner, subject to no servitude as such, but subject, of course, to the right of the dominant sovereignty, state or Federal, to take or appropriate his riparian properties for public use, but upon payment of compensation.

So far from the statute being a statute to improve navigation, it is intended to destroy navigation, and by closing the creek to prevent all access by riparian proprietors.

The taking by statute of the private property of a person or corporation is not due process of law. *Yates* v. *Milwaukee,* 10 Wall. 504; *Pumpelly* v. *Green Bay. Co.,* 13 Wall. 166; *Missouri Pac. Ry.* v. *Nebraska,* 164 U. S. 417; *Holden* v. *Hardy,* 169 U. S. 383; *Muhlker* v. *New York & H. R. Co.,* 197 U. S. 544.

The cases relied on by the defense, *Willson* v. *Black Bird Creek Marsh Co.,* 2 Pet. 247; *Gilman* v. *Philadelphia,* 3 Wall. 713, are inapplicable and can be distinguished.

The statute is special legislation under Const. South Carolina, Art. III, § 34. The General Assembly shall not enact local or special laws to lay out, open, alter or work roads or highways. *Dean* v. *Spartanburg,* 59 S. Car. 110; *State* v. *Queen,* 62 S. Car. 250; *Grocery Co.* v. *Burnett,* 61 S. Car. 211.

A navigable stream is a highway, *Heyward* v. *Chisolm,* 11 Rich. 263, and it is so declared by the constitutional and statutory provisions.

The statute is void under §§ 31, 34, of the Code of Laws, 1902, prohibiting the passage of private laws without notice.

*Mr. Theodore G. Barker* for appellees.

MR. JUSTICE BROWN, after making the foregoing statement, delivered the opinion of the court.

The gravamen of the bill is the alleged impairment by the statute of 1903 of the contract entered into in 1898, by which defendants agreed to remove the dam then existing, and to allow such creek to remain open and unobstructed.

It was also charged that the constitution of South Carolina declaring that all navigable waters should forever remain public highways was a privilege annexed to and constituting a part of the value of the lands, and that the damming of the creek, except for the purpose of the public health, welfare and safety and without due compensation therefor, was a destruction of the property of the plaintiff and a deprivation thereof without due process of law.

The specific injury complained of is that the plaintiff is the owner of a rice plantation on the North Santee River, bordering on Minim Creek, a tributary of the Santee, and lying in part just opposite the mouth or entrance of Kinloch Creek; that, relying on the agreement of the defendants, he had also purchased a millsite on the Santee, which could be used for a rice mill or a saw mill, the chief element of value of which was the water connection by means of a canal with Bluff Back Creek, accessible only through Kinloch Creek, and the consequent necessity of keeping Kinloch Creek open and unobstructed; that Kinloch Creek is a water highway, navigable by vessels into the Santee River and thence into the ocean; that the erection and retention of a dam across Kinloch Creek would not only interrupt his use of Kinloch Creek and Bluff Back Creek by preventing access to the public landing on the state road from his plantation on Kinloch Creek, but would obstruct the inflow of the tide of the Santee River through Minim Creek, causing the water from the river to flow back upon the banks to the plantation opposite the mouth of Kin-

loch Creek, and would thus compel him to raise and strengthen his banks.

1. The first question considered by the court below was whether Kinloch Creek was a navigable water of the United States, as defined in the case of *The Montello*, 11 Wall. 411; *S. C.*, 20 Wall. 430, or navigable, as navigable streams are defined by the constitution and the laws of South Carolina. The court was of opinion, based apparently upon affidavits not sent up with the record, that the creek was not a navigable stream under these definitions.

But the bill alleges that "Kinloch Creek is a navigable stream or water highway," and the cause was determined upon demurrer to the bill, which admits the allegation of the bill that the creek was navigable. As an original proposition we have repeatedly held that, in the absence of legislation by Congress, a State has power to improve its lands and promote the general health by authorizing a dam to be built across its interior streams, though they were previously navigable to the sea by vessels engaged in the coastwise trade. This was decided in *Willson* v. *Black Bird Creek Marsh Co.*, 2 Pet. 245, in a brief but cogent opinion by Mr. Chief Justice Marshall. An act of the State of Delaware gave the defendant the right to build a dam across the Black Bird Creek, the constitutionality of which act was attacked as an abridgement of the rights of those who had been accustomed to use it for the purposes of navigation. "But this abridgement," said the court (p. 251), "unless it comes in conflict with the Constitution or a law of the United States, is an affair between the government of Delaware and its citizens, of which this court can take no cognizance." The act was sustained. See also *Pound* v. *Turck*, 95 U. S. 459; *Gilman* v. *Philadelphia*, 3 Wall. 713; *Huse* v. *Glover*, 119 U. S. 543.

We do not think the provision of the constitution of South Carolina interferes with these common law powers of the State over its navigable waters. In *Escanaba Company* v. *Chicago*, 107 U. S. 678, 688, it was held that the right of bridging naviga-

ble streams extended to the State of Illinois, notwithstanding that the ordinance of 1787, for the government of the Northwest Territory, contained a clause declaring that "the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between them, shall be common highways and forever free." The power to span these rivers by bridges was put, partly upon the theory that the limitations upon the power of the State whilst in a territorial condition ceased to have any operative force except as voluntarily adopted by her after she became a State of the Union, and partly upon the theory, as said Mr. Justice Field, page 689, that "all highways, whether by land or water, are subject to such crossings as the public necessities and convenience may require, and their character as such is not changed, if the crossings are allowed under reasonable conditions, and not so as to needlessly obstruct the use of the highways."

So also in *Cardwell* v. *Bridge Co.*, 113 U. S. 205, a provision in the act admitting California, that "all the navigable waters within the said State shall be common highways and forever free," was held not to deprive the State of the power possessed by it to authorize the erection of bridges over navigable waters. Said the court, page 211, "the clause, therefore, in the act admitting California, quoted above, upon which the complainant relies, must be considered, according to these decisions, as in no way impairing the power which the State could exercise over the subject if the clause had no existence." To the same effect, *Willamette Iron Bridge Co.* v. *Hatch*, 125 U. S. 1; *Hamilton* v. *Vicksburg &c. R. R. Co.*, 119 U. S. 280, 284.

In *Lake Shore &c. R. R. Co.* v. *Ohio*, 165 U. S. 365, it was held that the act of September 19, 1890, conferring upon the Secretary of War the authority to direct the alteration of such bridges so as to render navigation easy and unobstructed, did not deprive the States of authority to bridge such streams.

While all of these cases turned upon the power of the State to authorize the erection of bridges, the same principle applies where the legislature deems it necessary to the public welfare

to make other improvements for the reclamation of swampy
and overflowed lands, though certain individual proprietors
may thereby be subjected to expense. The question whether
Kinloch Creek could be obstructed without the permission of
the Secretary of War does not arise in this case, and is specially
disclaimed by the plaintiff. See *Lake Shore &c. Railroad Co.*
v. *Ohio,* 165 U. S. 365; *Leovy* v. *United States,* 177 U. S. 621,
633; *Cummings* v. *Chicago,* 188 U. S. 410; *Montgomery* v. *Portland,* 190 U. S. 89.

The main argument was addressed to the question whether
the contract of August, 1898, providing for the removal of the
obstruction on December 31 and the free ingress and egress
through the creek thereafter, was impaired by the act of the
General Assembly of 1903, permitting the defendants by name
to construct and maintain the dam in question.

It is the settled law of this court that the interdiction of
statutes impairing the obligation of contracts does not prevent
the State from exercising such powers as are vested in it for
the promotion of the common weal, or are necessary for the
general good of the public, though contracts previously entered into between individuals may thereby be affected. This
power, which in its various ramifications is known as the police
power, is an exercise of the sovereign right of the Government
to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals. Familiar instances of this are,
where parties enter into contracts, perfectly lawful at the time,
to sell liquor, operate a brewery or distillery, or carry on a
lottery, all of which are subject to impairment by a change of
policy on the part of the State, prohibiting the establishment
or continuance of such traffic;—in other words, that parties
by entering into contracts may not estop the legislature from
enacting laws intended for the public good.

While this power is subject to limitations in certain cases,
there is wide discretion on the part of the legislature in determining what is and what is not necessary—a discretion which

courts ordinarily will not interfere with. The leading case upon this point is that of *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, in which a franchise to maintain a ferry between Cambridge and Boston, under which a bridge was subsequently erected, was held to be subject to the power of the legislature to establish a parallel bridge between the same points. In *Stone* v. *Mississippi,* 101 U. S. 814, a charter to a lottery company for twenty-five years was held to be subject to the power of the State to abolish lotteries altogether. Similar cases announcing the same principle are *Boyd* v. *Alabama,* 94 U. S. 645; *Beer Company* v. *Massachusetts,* 97 U. S. 25; *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S. 746; *New Orleans Gas Co.* v. *Louisiana Light Co.,* 115 U. S. 650, 672; *Mugler* v. *Kansas,* 123 U. S. 623, 665; *Chicago &c. R. R. Co.* v. *Chicago,* 166 U. S. 226.

It only remains to consider, in connection with this branch of the case, whether the act of the General Assembly of 1903 was a proper exercise of the police power of the State. Of this we have no doubt. Although it was not an exercise of that power in its ordinarily accepted sense of protecting the health, lives and morals of the community, it is defensible in its broader meaning of providing for the general welfare of the people, by the reclamation of swampy, overflowed and infertile lands, and the erection of dams, levees and dikes for that purpose. We have often held that private interests are subservient to that right, except where property is taken for which compensation must be paid, and must give way to any general scheme for the reclamation or improvement of such lands.

Indeed, this seems to have been within the contemplation of Congress in its act of September 28, 1850, 9 Stat. 519, to enable the States to reclaim the swamp lands within their limits, the first section of which enacts that "To enable the State of Arkansas to construct the necessary levees and drains to reclaim the swamps and overflowed lands therein, the whole of those swamp and overflowed lands, made unfit thereby for cultivation . . . shall be, and the same are hereby, granted

to said State." Section 4 extends this provision to the other States. Although the act has no direct bearing on this case, it recognizes an intent on the part of Congress to allow the States to regulate the disposal of overflowed lands, as the legislature shall deem best for the public interests. That the act of the General Assembly in question was passed upon this theory is indicated by its, recitals, that "by reason of the drainage and protection, of said lands from overflow, their taxable value will be greatly enhanced, and without the dam provided for in this bill a large part of the land bordering on said creek will eventually become abandoned and valueless, as some portions of it now are," and that this "is the only feasible and practicable scheme for the drainage of said lands." This was the reason given for the passage of the act of the General Assembly of Delaware in the *Black Bird Creek case*, already cited. Chief Justice Marshall observed (p. 251): "The value of the property on its banks must be enhanced by excluding the water from the marsh, and the health of the inhabitants probably improved. Measures calculated to produce these objects, provided they do not come into collision with the powers of the General Government, are undoubtedly within those which are reserved to the States." Several subsequent decisions have confirmed the power of the State to deal, in the absence of Congressional legislation, with their rivers, for the purposes of their internal improvement, such as *Withers* v. *Buckley*, 20 How. 84, wherein the right of Mississippi to change the channels or courses of rivers within the State for the purpose of improvement was sustained, and *Atkinson* v. *Philadelphia &c. R. R. Co.*, 2 Fed. Cases, 105, Case 615, a decision by Mr. Justice Baldwin of this court.

The whole subject was recently discussed in the case of *Leovy* v. *United States*, 177 U. S. 621, wherein was vindicated the right of the State of Louisiana to authorize the construction and maintenance of levees, drains and other structures necessary and suitable to reclaim swamp and overflowed lands, although there was evidence that the stream there concerned

(Red. Pass) was useful for some minor purposes of interstate commerce. There was testimony that luggers or yawls chiefly used by fishermen to carry oysters to and from their beds sometimes went through this pass, but it was not shown that passengers ever went through it, or that freight destined for any other State was ever carried through it.

In delivering an exhaustive opinion in this case, Mr. Justice Shiras observed (p. 636): "We think that the trial court might well take judicial notice that the public health is deeply concerned in the reclamation of swamp and overflowed lands. If there is any fact which may be supposed to be known by everybody, and, therefore, by courts, it is that swamps and stagnant waters are the cause of malarial and malignant fevers, and that the police power is never more legitimately exercised than in removing such nuisances."

While, as already observed, there is a general allegation in the bill that Kinloch Creek was a navigable stream, and was capable of navigation by vessels in the Santee River and thence into the ocean, there is no allegation that it was ever used for that purpose, and the opinion of the court was that it certainly was not a navigable water of the United States, or a public highway under the laws of South Carolina. But, however this may be, we are of opinion that the State had full power, in the absence of legislation by Congress, to authorize the construction of this dam for the avowed purposes of this act.

2. The second assignment of error, that the plaintiff was deprived of his property without compensation, and hence without due process of law, is also unsound.

The only allegation of the bill in that connection is that the construction of the dam was not only a destruction of plaintiff's right of navigation and of his access to his lands through Kinloch Creek, but has caused the water to fall back to some extent on the plantation on Minim Creek, just opposite the mouth of Kinloch, so as to compel the plaintiff to raise his dikes. We do not think the overflow to the minor extent indicated constitutes a taking of property within the meaning of

the law, when the damage can be prevented by raising the banks, or that if the damage stated did in fact result, that it would justify the interposition of a court of equity.

The question whether the overflow of lands constitutes "a taking" within the constitutional provision has been discussed in several cases in this court. *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166; *Transportation Company* v. *Chicago*, 99 U. S. 635; *Gibson* v. *United States*, 166 U. S. 269; *Scranton* v. *Wheeler*, 179 U. S. 141; *Atwater* v. *Trustees*, 124 N. Y. 602.

A recent case is that of *United States* v. *Lynah*, 188 U. S. 445, wherein it was held that where the Government had placed dams and other obstructions in the Savannah River in such manner as to hinder its natural flow, and to raise the water so as to overflow plaintiff's lands and to cause a total destruction of their value, the proceeding must be regarded as an actual appropriation of the land, and created an obligation upon the Government to make compensation for the land. The case was distinguished from that of *Mills* v. *United States*, 46 Fed. Rep. 738, wherein the damage consisted in obliging the plaintiff to raise the levees around his rice fields to prevent the flooding of the fields in high water. "Obviously," said the court, in commenting upon that case, "there was no taking of plaintiff's lands, but simply an injury which could be remedied at an expense, as alleged, of $10,000, and the action was one to recover the amount of this consequential injury. The court rightfully held that it could not be sustained." A still more recent case is that of *Bedford* v. *United States*, 192 U. S. 217, in which it is held that damages to lands by flooding as a result of revetments erected by the United States along the banks of the Mississippi River to prevent erosion of the banks from natural causes, are consequential and do not constitute a taking of the lands flooded within the meaning of the Constitution.

We think the rule to be gathered from these cases is that where there is a practical destruction, or material impairment of the value of plaintiff's lands, there is a taking, which de-

mands compensation, but otherwise where as in this case plaintiff is merely put to some extra expense in warding off the consequences of the overflow.

The damage claimed by the plaintiff in the interruption of access to his lands and the impairment of his right to navigate the creek does not demand separate consideration. We have repeatedly held that where the Government of the United States has, for the purposes of improving the navigation of a river, erected piers or other structures by which access to plaintiff's land is rendered more difficult, there is no claim for compensation. *Gibson* v. *United States*, 166 U. S. 269; *Scranton* v. *Wheeler*, 179 U. S. 141. We see no reason why the same principle should not apply to cases where the state legislature, exercising its police power, directs a certain dam to be built, and thereby incidentally impairs access to lands above the dam. In both cases the sovereign is exercising its constitutional right—in one case in improving the navigation of the river, and in the other in draining its low lands and thereby enhancing their value for agricultural purposes.

It is suggested that the agreement of 1903 created an easement of access to plaintiff's land, *Ladd* v. *Boston*, 151 Massachusetts, 585; *Hogan* v. *Barry*, 143 Massachusetts, 538, and that the statute of South Carolina must be construed as overriding private rights of property, and not merely as putting an end to the rights of the public, and as giving to plaintiff a claim for damages for the taking of that easement. But it does not necessarily follow that an injunction should issue. Apparently this covenant did not apply to the millsite, since this was purchased after the covenant was made, but, however this may be, a court of equity is not bound to enjoin a public work authorized by statute, until compensation is paid, where no property is directly appropriated. This is particularly true where the damage is difficult of ascertainment at the time and a reasonable provision is made by the law for compensation. *Sweet* v. *Rechel*, 159 U. S. 380; *Backus* v. *Fort Street Union Depot Co.*, 169 U. S. 557; *Cherokee Nation* v.

*Southern Kansas Ry. Co.,* 135 U. S. 641; *Beasley* v. *Texas & Pacific Ry. Co.,* 191 U. S. 492; *Haverhill Bridge Proprietors* v. *Essex County Commissioners,* 103 Massachusetts, 120; *Parker* v. *Catholic Bishop,* 146 Illinois, 158. The state cases are numerous on this point.

In view of the incidental character of the damage probably resulting to plaintiff's land from the erection of this dam, and the careful provision of the act that the defendants shall be liable for such damage, we do not think, at least in the absence of an allegation that the defendants are financially irresponsible, that a court of equity would be authorized to enjoin the erection until the damages, which, if they exist at all, must be very difficult of ascertainment, shall be paid.

3. It is also assigned as error that the act of 1903 is obnoxious to the following provisions of the constitution of South Carolina, Article III, section 34, that "The General Assembly of the State shall not enact local or special laws concerning any of the following subjects, or for any of the following purposes, to wit: . . . II. To lay out, open, alter or work roads or highways."

As the case comes from a Federal court the question is properly before us.

Admitting that, for the purposes of transit and travel, a river may be considered a highway—and that seems to have been adjudged by the Supreme Court of South Carolina, *Heyward* v. *Chisholm,* 11 Rich. 253,—we think that, in connection with the words "To lay out, open, alter or work roads," the word "highway" is used in its ordinary sense, and as an equivalent to a public road. The power given by this section is evidently inapplicable to water highways, which are neither laid out, opened, altered or worked in the ordinary sense of these words.

4. It is also urged that the act was passed without the formality required by the Revised Statutes of South Carolina of 1893, in which it is declared that no bill for the granting of any privilege or immunity, or for any other private purpose

whatsoever, shall be introduced, or entertained in either house of the General Assembly except by petition, to be signed by the persons desiring such privilege, of which sixty days' notice shall be given to all persons interested, and be published in the newspaper having the largest circulation in the county where such privilege is to be enjoyed, once a week for three weeks, etc.

As this is not a constitutional provision, but a general law enacted by the legislature, it may be repealed, amended or disregarded by the legislature which enacted it. This law was doubtless intended as a guide to persons desiring to petition the legislature for special privileges, and it would be a good answer to any petition for the granting of such privileges that the required notice had not been given; but it is not binding upon any subsequent legislature, nor does a non-compliance with it impair or nullify the provisions of an act passed without the requirement of such notice.

There was no error in the action of the court below, and its judgment is, therefore,

*Affirmed.*