985 So.2d 184 (2008)
UNITED TEACHERS OF NEW ORLEANS, Tammy L. Davis, Wanda C. Gaudet, and Valerie M. Prier
v.
STATE BOARD OF ELEMENTARY AND SECONDARY EDUCATION, State Department of Education, Recovery School District, and The Orleans Parish School Board.
No. 2007 CA 0031.
Court of Appeal of Louisiana, First Circuit.
March 26, 2008.
*188 Larry Samuel, William E. Rittenberg, Rittenberg, Samuel & Phillips, L.L.C., New Orleans, LA and David J. Strom, Teresa J., Idris, Samuel J. Lieberman, American Federation of Teachers Legal Department, Washington, D.C., for Plaintiffs-Appellants United Teachers of New Orleans, Tammy L. Davis, Wanda C. Gaudet, and Valerie M. Prier.
Michael H. Rubin, M. Brent Hicks, Eboni Townsend, McGlinchey Stafford, PLLC, Baton Rouge, LA and Uma M. Subramanian, Assistant Attorney General Louisiana, Department of Justice Baton, Rouge, LA, for Defendants-Appellees State of Louisiana, the State Board of Elementary and Secondary Education, the Louisiana Department of Education, and the Recovery School District.
Keith M. Pyburn, Scott D. Schneider, Raul V. Esquivel III, Fisher & Phillips LLP., New Orleans, LA, for Defendant-Appellee The Orleans Parish School Board.
Jonathan C. Augustine, Terrel J. Broussard, Montgomery, Harnett, Brown, Read, Hammond, & Mintz, LLP, Baton Rouge, LA, for Amicus Curiae Rev. Jesse L. Jackson, Sr. and The Rainbow-PUSH Coalition.
Before PARRO, KUHN, and DOWNING, JJ.
PARRO, J.
Plaintiffs appeal the judgment of the trial court sustaining the defendants' peremptory exception pleading the objection of no cause of action and dismissing their claims against the defendants, with prejudice.[1] For the reasons that follow, we affirm.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY
This matter involves a constitutional challenge to Act 35 of the First Extraordinary Session of 2005 (Act 35), which was passed by the Louisiana Legislature (legislature) in the wake of Hurricanes Katrina and Rita and became effective on November 30, 2005. Act 35 made several changes to the statutory scheme governing failing schools and school systems that are academically in crisis. Subsequent to these changes, a significant number of schools in Orleans Parish were removed from the control of the Orleans Parish School Board (OPSB) and placed under the supervision of the Recovery School District (RSD).[2]
In March 2006, United Teachers of New Orleans (UTNO), Tammy L Davis, Wanda C. Gaudet, and Valerie M. Prier (collectively, plaintiffs),[3] filed a petition for declaratory *189 judgment seeking a declaration that certain provisions of Act 35 are unconstitutional because they impair the obligation of contracts between LTTNO and OPSB. Named as defendants were the State Board of Elementary and Secondary Education (BESE), the Louisiana Department of Education, and the RSD (collectively, the State defendants). OPSB also was named as a defendant.
In the petition, plaintiffs asserted three counts challenging the constitutionality of the Act: (1) Act 35 violates the contract clauses of the Louisiana Constitution of 1974 and the United States Constitution, which prohibit the enactment of laws that impair the obligation of contracts; (2) the State defendants have applied Act 35 in an arbitrary, irrational, and capricious manner that is inconsistent with the legislative intent; and (3) implementation of Act 35 results in a state takeover of virtually an entire local school system, in violation of the Louisiana Constitution of 1974. In addition to a declaration that certain provisions of Act 35 are unconstitutional, plaintiffs sought an order returning control of the Orleans Parish public schools to OPSB, a declaration that the collective bargaining agreements (CBAs) between UTNO and OPSB remained in effect, and an order requiring OPSB to comply with the CBAs.[4] Plaintiffs further requested damages and attorney fees.
The State defendants answered the suit and raised various exceptions and affirmative defenses. Specifically, these defendants filed a peremptory exception pleading the objections of no cause of action and no right of action.[5] The State defendants later filed a motion for summary judgment seeking dismissal of the plaintiffs' suit. OPSB also responded to the petition by filing a peremptory exception of no cause of action.
The motion for summary judgment and the various exceptions were set for trial on September 18, 2006. Shortly before the hearing, plaintiffs filed a motion for leave to amend their petition for declaratory judgment. The proposed amendment sought to withdraw the claims of the individual plaintiffs, as well as counts 2 and 3 of the original petition, and to dismiss these claims without prejudice. In addition, attached to the proposed amendment were two bargaining orders that plaintiffs requested the court impose on RSD and OPSB, compelling them to collectively bargain with UTNO.
At the hearing, the trial court addressed the proposed amendment first. The State defendants opposed the amendment, contending that the trial court should simply dismiss these claims, with prejudice, by sustaining their exceptions raising the objections of no right of action and no cause of action. In addition, the State defendants argued that RSD could not be compelled to bargain with UTNO. Plaintiffs acknowledged that RSD and OPSB were under no obligation to bargain with UTNO, but insisted that the trial court could compel them to do so as a remedy for declaring Act 35 unconstitutional. As *190 for the dismissal of counts 2 and 3 and the claims of the individual plaintiffs, plaintiffs admitted that they had no desire to pursue those claims at that time, but argued that they did not want to foreclose any opportunity of urging those claims again in the future. After considering these arguments, the trial court denied the motion for leave to amend.
The trial court then addressed the objection of no right of action, which challenged the right of the individual plaintiffs to assert claims against the defendants. Plaintiffs offered no opposition to the objection, and the claims of the individual plaintiffs against the State defendants were dismissed. After hearing oral argument from the parties on the exception raising the objection of no cause of action filed by the State defendants, the trial court sustained the exception and dismissed the plaintiffs' claims against the State defendants.[6] Finally, the trial court sustained the exception raising the objection of no cause of action filed by OPSB. The trial court signed a judgment in accordance with these oral rulings on September 27, 2006.[7] This appeal by plaintiffs followed.

ACT 35 AND OTHER LEGISLATION
In 2003, Louisiana voters approved an amendment to Article VIII, section 3(A) of the Louisiana Constitution of 1974. The amendment, effective November 6, 2003, authorized BESE to take control of "a public elementary or secondary school which has been determined to be failing." As amended, that section provides:
(A) Creation; Functions. The State Board of Elementary and Secondary Education is created as a body corporate. It shall supervise and control the public elementary and secondary schools and special schools under its jurisdiction and shall have budgetary responsibility for all funds appropriated or allocated by the state for those schools, all as provided by law. The board shall have other powers, duties, and responsibilities as provided by this constitution or by law, but shall have no control over the business affairs of a city, parish, or other local public school board or the selection or removal of its officers and employees; however, the board shall have the power to supervise, manage, and operate or provide for the supervision, management, and operation of a public elementary or secondary school which has been determined to be failing, including the power to receive, control, and expend state funds appropriated and allocated pursuant to Section 13(B) of this Article, any local contribution required by Section 13 of this Article, and any other local revenue available to a school board with responsibility for a school determined to be failing in amounts that are calculated based on the number of students in attendance in such a school, all in the manner provided by and in accordance with law. (Emphasis added.)
*191 In connection with this amendment, the legislature passed several statutes that went into effect upon approval of the amendment. With LSA-R.S. 17:10.5, the legislature defined a "failed school" as one that had been designated as academically unacceptable under a uniform statewide program of school accountability established by rules adopted by BESE. When a school had been designated as academically unacceptable for four consecutive years, the school would be removed from the jurisdiction of the local school board and transferred to the jurisdiction of the RSD, upon the approval of BESE. LSA-R.S 17:10.5(A)(1).[8] Such a failed school would then be reorganized, as necessary, and operated by the RSD in such a manner as to bring the school to an acceptable level of performance. LSA-R.S. 17:10.5(B).
With LSA-R.S. 17:1990(A)(1), the legislature created the RSD, effective November 6, 2003, and authorized it to "provide an appropriate education for children attending any public elementary or secondary school" that had been transferred to the jurisdiction of the RSD pursuant to LSA-R.S. 17:10.5. To that end, the RSD was granted the authority to "provide for the supervision, management, and operation of a school placed under its jurisdiction . . . with all the same power and authority as the prior system from which it was transferred[.]" LSA-R.S. 17:1990(B)(2)(a). Moreover, the RSD was authorized to employ such staff members as it deemed necessary. However, the RSD was required to give priority consideration for employment to "any certified teacher with regular and direct responsibility for providing classroom instruction to students who is employed in the transferred school by the prior system[.]" LSA-R.S. 17:1990(D)(1). The statute further provided that any person employed by the prior system in a transferred school had the option of remaining in the employ of the prior system. In such a situation, the prior system was obligated to retain and reassign the employee in accordance with its contractual obligations or applicable policies. LSA-R.S. 17:1990(D)(2).
In 2004, the legislature enacted LSA-R.S. 17:10.6, which restricted the authority of the local school board to act once the school system was determined to be "academically in crisis." Pursuant to the statute, "academically in crisis" was defined as "any local system in which more than thirty schools are academically unacceptable or more than fifty percent of its students attend schools that are academically unacceptable." LSA-R.S. 17:10.6(B)(1). When such conditions existed, the statute restricted the local school board's authority such that it could act only in certain specified situations. However, the statute specifically authorized the local school board to enter into collectively bargained contracts with its employees and provided for the local superintendent, or his designee, to be the chief negotiator for the local school board in such negotiations. LSA-R.S. 17:10.6(C)(l)(g).[9]
Against this backdrop, the legislature passed Act 35 in 2005. Act 35 made no changes to LSA-R.S. 17:10.5 or 10.6; however, it did enact an entirely new statute, LSA-R.S. 17:10.7, which provides, in pertinent part:
A.(1) Each elementary or secondary school that participates in a Spring cycle of student testing and has a baseline *192 school performance score below the state average . . . that is a school in or granted a charter by a city, parish, or other local public school system that has been declared to be academically in crisis pursuant to R.S. 17:10.6, and that has at least one school eligible to transfer to the Recovery School District pursuant to R.S. 17:10.5, shall be designated a failing school and shall be transferred to the jurisdiction of the Recovery School District established in R.S. 17:1990. The Recovery School District . . . shall provide all educational services required of any city, parish, or other local public school system in order to meet the educational needs of all students residing in the jurisdiction of the transferring local school system who were attending a transferred school or who would have been eligible to attend such transferred school because of the residential location of the student or as the result of any other option or program available to the student.
Thus, under LSA-R.S. 17:10.5, which was in effect prior to Act 35, a school could be transferred to the jurisdiction of the RSD if certain conditions existed, subject to the approval of BESE. Under LSA-R.S. 17:10.7 as enacted pursuant to Act 35, a school could be transferred immediately and automatically to the jurisdiction of the RSD for a minimum of five school years[10] if certain conditions existed. Although the criteria necessary for designating a school as a failed school pursuant to LSA-R.S. 17:10.5 remained unchanged, LSA-R.S. 17:10.7 added new criteria by which a school could be designated as failing. According to plaintiffs, these differences constituted a drastic change in the definition of what constituted a failed school under the law and further resulted in the automatic transfer of the vast majority of Orleans Parish schools to the RSD. Because the RSD failed to apply the CBAs that had been negotiated between UTNO and OPSB to the schools under its authority, plaintiffs contend that the CBAs were abrogated in violation of the contract clauses of the state and federal constitutions.

NO CAUSE OF ACTION
On appeal, plaintiffs challenge the trial court's ruling sustaining the State defendants' exception raising the objection of no cause of action. A cause of action, when used in the context of the peremptory exception, is defined as the operative facts that give rise to the plaintiff's right to judicially assert the action against the defendant. Ramey v. DeCaire, 03-1299 (La.3/19/04), 869 So.2d 114, 118. The purpose of an exception raising the objection of no cause of action is to determine the sufficiency in law of the petition. The exception is triable on the face of the petition. For the purpose of determining the issues raised by the exception, the well-pleaded facts in the petition must be accepted as true. City of New Orleans v. Board of Commissioners of Orleans Levee District, 93-0690 (La.7/5/94), 640 So.2d 237, 241; see LSA-C.C.P. arts. 927 and 931. However, the mere conclusions of the plaintiff, unsupported by facts, do not set forth a cause of action. Ramey, 869 So.2d at 118. The burden of demonstrating that no cause of action has been stated is on the party filing the exception. Home Distribution, Inc. v. Dollar Amusement, Inc., 98-1692 (La.App. 1st Cir.9/24/99), 754 So.2d 1057, 1060.
The reviewing court conducts a de novo review of a trial court's ruling sustaining an exception raising an objection of no cause of action, because the objection raises a question of law, and the *193 lower courts decision is based only on the sufficiency of the petition. B & C Electric, Inc. v. East Baton Rouge Parish School Board, 02-1578 (La.App. 1st Cir.5/9/03), 849 So.2d 616, 619. In ruling on an exception raising the objection of no cause of action, the court must determine whether the law affords any relief to the claimant if he proves the factual allegations in the petition at trial. Home Distribution, 754 So.2d at 1060. No evidence may be introduced to support or controvert the objection that the petition fails to state a cause of action. LSA-C.C.P. art. 931. When a petition is read to determine whether a cause of action has been stated, it must be interpreted, if possible, to maintain the cause of action instead of dismissing the petition. Any reasonable doubt concerning the sufficiency of the petition must be resolved in favor of finding that a cause of action has been stated. Brister v. GEICO Insurance, 01-0179 (La.App. 1st Cir.3/28/02), 813 So.2d 614, 617.
Louisiana Code of Civil Procedure article 934 provides, in part, that "[w]hen the grounds of the objection pleaded by the peremptory exception may be removed by amendment of the petition, the judgment sustaining the exception shall order such amendment within the delay allowed by the court." However, Article 934 further provides that if the grounds of the objection cannot be removed by amendment, the action shall be dismissed.

CONTRACT CLAUSE
Article I, Section 10(1) of the United States Constitution provides, "No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts. . . ." Article I, Section 23 of the Louisiana Constitution of 1974 provides, "No bill of attainder, ex post facto law, or law impairing the obligation of contracts shall be enacted." The Louisiana Supreme Court has described these provisions as "virtually identical" and "substantially equivalent." Board of Commissioners of Orleans Levee District v. Department of Natural Resources, 496 So.2d 281, 291 (La.1986). Although the language of each clause is facially absolute, its prohibition must be accommodated to the inherent police power of the state to safeguard the vital interests of its people. Energy Reserves Group, Inc. v. Kansas Power and Light Company, 459 U.S. 400, 410, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983); Board of Commissioners, 496 So.2d at 292. As the United States Supreme Court stated in Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 241, 98 S.Ct. 2716, 2721, 57 L.Ed.2d 727 (1978), quoting Manigault v. Springs, 199 U.S. 473, 480, 26 S.Ct. 127, 130, 50 L.Ed. 274 (1905):
It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which, in its various ramifications, is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.
In Board of Commissioners, the Louisiana Supreme Court set forth the appropriate contract clause analysis as enunciated by the United States Supreme Court in Energy Reserves Group, Inc. Under this four-step analysis, the court must determine whether the state law has, in fact, impaired a contractual relationship. The party complaining of unconstitutionality *194 has the burden of demonstrating, first, that the statute alters contractual rights or obligations. Board of Commissioners, 496 So.2d at 292. Second, if an impairment is found, the court must determine whether the impairment is of constitutional dimension. Third, if the state regulation constitutes a substantial impairment, the court must determine whether a significant and legitimate public purpose justifies the regulation. Finally, if a significant and legitimate public purpose exists, the court must determine whether the adjustment of the rights and responsibilities of the contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption. Segura v. Frank, 93-1271 (La.1/14/94), 630 So.2d 714, 729.
Impairment of Contractual Relationship
Regarding the first inquiry, we determine that the application of Act 35 does not alter or impair the contractual rights or obligations between UTNO and OPSB as set forth in the relevant CBAs. UTNO contends that its contractual rights were impaired because the RSD had no intention of applying the CBAs in the schools transferred to its jurisdiction. It is clear, however, that the RSD is under no obligation to apply those CBAs in the schools it supervised and operated, as it was never a party to the CBAs.
The RSD and OPSB are separate and distinct entities. It is true that the law in effect prior to Act 35 vested the RSD with the same power and authority previously vested in OPSB with regard to the schools transferred to its jurisdiction. LSA-R.S. 17:1990(B)(2)(a). However, this statute did not require the RSD to assume all of the employment-related obligations previously owed by OPSB, as the RSD was specifically given the authority to hire such staff as it deemed necessary, with the restriction that the RSD was to give priority consideration to certain teacher employees who were employed in the transferred school by the prior system.[11] LSA-R.S. 17:1990(D)(1).
In addition, we note that OPSB is still in operation. Indeed, at the time this matter was orally argued before this court, UTNO had begun negotiations with OPSB on new CBAs to be applied in the schools operated by OPSB. Furthermore, as noted above, Act 35 merely created additional criteria by which a school could be determined to be failing and provided for the automatic transfer of such schools to the jurisdiction of the RSD. Act 35 did not modify or destroy OPSB's obligations pursuant to the CBAs it had negotiated with UTNO. Thus, OPSB still had the obligation to retain and reassign its employees in accordance with its contractual obligations and applicable policies, until the CBAs expired *195 by their own terms on June 30, 2006. See LSA-R.S. 17:1990(D)(2). Accordingly, we find no impairment of the CBAs in existence between UTNO and OPSB.[12]
Constitutional Dimension of Impairment
The next element of the analysts requires the court to determine whether the impairment is one of constitutional dimension. This inquiry requires the court to determine the severity of the impairment. Minimal alteration of contractual obligations may end the inquiry at its first stage, while severe impairment will push the inquiry to a careful examination of the nature and purpose of the state legislation. Segura, 630 So.2d at 729. The impairment need not rise to the level of total destruction of contractual expectations to be termed substantial. However, in determining the extent of the impairment, a court may also consider whether the industry the complaining party has entered has been regulated in the past. See Energy Reserves Group, Inc., 459 U.S. at 411, 103 S.Ct. at 704. Where a party enters a contractual relationship in a heavily regulated industry, expectations of further regulation of that industry may lessen the severity of a subsequent impairment of that party's contractual rights and obligations. Segura, 630 So.2d at 730.
As we have already determined, Act 35 does not impair the contractual relationship between OPSB and UTNO. However, even if such impairment were found, we believe that the impairment is not of constitutional dimension, because UTNO's contractual expectations were not substantially impacted.
In the present case, the severity of any alleged impairments of UTNO's contractual obligations can be measured by determining the extent to which their contractual expectations would be frustrated by the application of Act 35. As noted above, whatever contractual rights the employees may have had against OPSB, pursuant to the CBAs, remained in effect after the passage of Act 35 and were protected by statute. See LSA-R.S. 17:1990(D)(2). State regulation that restricts a party to the gains it reasonably expected from the contract does not necessarily constitute a substantial impairment. Segura, 630 So.2d at 729.
Furthermore, we note that education is a heavily regulated area. See Rousselle v. Plaquemines Parish School Board, 93-1916 (La.2/28/94), 633 So.2d 1235, 1241. The state and its political subdivisions have traditionally regulated the area of education, which is protected under Article VIII of the Louisiana Constitution of 1974. In light of the state's broad power to regulate the area of education as provided for in the constitution, as well as the state's traditional exercise of that power, UTNO had reason to anticipate its rights and obligations under the CBAs might be altered by future legislation. See Segura, 630 So.2d at 731.
In its brief to this court, UTNO acknowledges the state's strong involvement in education, but attempts to avoid the implications of this traditional regulation by framing the issue as one involving the regulation of "public sector labor relations." According to UTNO, such relations are not heavily regulated; therefore, neither UTNO nor OPSB could reasonably have expected the legislature to modify, *196 much less destroy, the CBAs. This argument is without merit.
Clearly, Act 35 was passed in an effort to regulate and improve the education provided to Louisiana children throughout the state's public schools. Act 35 directly addresses the quality of schools within the public school system and provides for certain actions to be taken when schools fail to meet educational standards established by BESE pursuant to the authority vested in it by the state constitution. Act 35 further provides a mechanism for the transfer of such schools to the RSD in an effort to improve the level of public education provided to Louisiana children. Act 35 was not passed in an attempt to impact "public sector labor relations," and any impact it may have had on such relations is merely secondary and unintentional.
Significant and Legitimate Public Purpose
The third inquiry of the analysis is whether a significant and legitimate public purpose justifies the regulation.[13] This requirement is primarily designed to prevent a state from embarking on a policy motivated by a simple desire to escape its financial obligations or to injure others through the repudiation of debts or the destruction of contracts or the denial of the means to enforce them. Segura, 630 So.2d at 731.
As noted above, Act 35 was designed to regulate and improve the education provided to Louisiana children throughout the state's public schools. As such, it constitutes a legitimate exercise of the state's police power to protect the general welfare of its people. See Allied Structural Steel Co., 438 U.S. at 241, 98 S.Ct. at 2721; Manigault, 199 U.S. at 480, 26 S.Ct. at 130. Therefore, we find that a significant and legitimate public purpose justifies the passage of Act 35.
Appropriateness of Adjustment of Contractual Rights and Responsibilities
Once the court finds a significant and legitimate public purpose supporting the legislation, the court must determine whether the adjustment of the rights and responsibilities of the contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislature's adoption. Unless the state itself is a contracting party, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure. Segura, 630 So.2d at 732.
UTNO contends that no deference is due to the legislature's judgment in this matter, because the state itself is a party to the CBAs at issue. In support of this argument, UTNO argues that OPSB and other parish school boards are agencies of the state as administrators of public education, relying on Rousselle, 633 So.2d at 1241. According to UTNO, the fact that the state has impaired contracts to which it was a party requires this court to determine whether the impairment is reasonable and necessary, without deference to the judgment of the legislature.
In Rousselle, 633 So.2d at 1238, the plaintiff was a tenured career employee of the Plaquemines Parish School Board. He was promoted to the level of a principal of a public high school by a two-year promotional contract entered on July 3, 1990. *197 In 1991, during the term of this contract, the legislature passed Act 779, which amended LSA-R.S. 17:444(B)(4)(c)(iv) and provided for the retroactive application of the amendment. According to the plaintiff, the statute, as amended, required the school board to offer him a new contract at the expiration of his existing contract, since his overall performance had been rated as satisfactory, he had been recommended for reappointment, and his position had not been discontinued or eliminated. When the school board failed to offer such a contract and voted not to renew his previous contract, the plaintiff filed a writ of mandamus seeking the court to compel the school board to offer him a new contract as required by law. Rousselle, 633 So.2d at 1238.
In arguing against the retroactive application of the amendment, the school board contended that such application would impair its vested contractual rights. Rousselle, 633 So.2d at 1245. However, the court determined that the retroactive application of Act 779 did not unconstitutionally impair the school board's contractual rights, because the school board was an agency of the state and was aware of the legislature's broad and pervasive power to regulate public education. Rousselle, 633 So.2d at 1246. The court further determined that the school board was not protected by the contract clause prohibitions of the state or federal constitutions and that there was no need to apply the four-step contract clause analysis to the retroactive application of Act 779. Rousselle, 633 So.2d at 1247.
We do not find this case dispositive in this matter. Rousselle did not determine that the school board was the "state" for purposes of the contract clause analysis. Indeed, the Rousselle court declined to apply the contract clause analysis to the issues before it. Furthermore, unlike the school board in Rousselle, OPSB has not sought protection from the effects of Act 35 by invoking the state and federal contract clauses. Instead, through this lawsuit, the plaintiffs have attempted to enforce the terms of the CBAs on the RSD, a party that was never involved in the negotiation of the CBAs or bound by their terms. Thus, we find that great deference is given to the judgment of the legislature as to the necessity and reasonableness of Act 35.
Furthermore, even if OPSB were considered the "state" for these purposes, and if the judgment of the legislature were due no deference, we nevertheless find that whatever adjustment of rights and obligations may have occurred as a result of the passage of Act 35 was reasonable and appropriate under the circumstances. Plaintiffs cite numerous cases purportedly supporting their assertion that Act 35 was not based upon reasonable conditions or narrowly drawn as to minimize its impairment of the CBAs. However, unlike these cases, Act 35 was not an attempt to save money during a "budget crunch" by delaying the payment of public employees.[14] Instead, Act 35 was an attempt to improve the education provided to Louisiana children through the public school system, in accordance with the goal of the system as expressed in the Louisiana Constitution of 1974.[15]
*198 Furthermore, although we have found that Act 35 did not impair the CBAs at issue, whatever adjustment or impairment might have occurred was minimal. Act 35 became effective on November 30, 2005. By statutory authority in existence prior to the passage of Act 35, OPSB was required to comply with its contractual obligations under the CBAs, regardless of the effect of the newly passed Act. Furthermore, no suit was filed in this matter until March 2006, and the CBAs were scheduled to expire by their own terms on June 30, 2006. Thus, any adjustment or impairment would have lasted only a few months.
In an effort to expand the alleged impact of Act 35, UTNO contends that the Act abrogated not only the specific CBAs in effect at the time of its passage, but also a thirty-year-old system of collective bargaining between the union and OPSB. However, as UTNO has previously admitted, neither OPSB nor the RSD was under any obligation to bargain with the union. Thus, while UTNO may have believed that it would have continued to negotiate with OPSB or the RSD on future CBAs once the current CBAs expired, this expectation is not reasonably based on any statutory, jurisprudential, or contractual authority.

ANALYSIS
Accepting ail of the allegations in the petition as true and applying the legal principles set forth above, we find the petition fails to allege facts sufficient to state a cause of action. The petition consists primarily of general conclusions that Act 35 violates the contract clauses of the United States and Louisiana Constitutions by impairing the obligations of the CBAs in existence between OPSB and UTNO. The petition references certain portions of Act 35 that have allegedly impaired the obligations of these CBAs; however, the plaintiffs do not specify how the CBAs have been impaired. Instead, the petition merely sets forth the legal analysis applicable to a determination of whether a statute is in violation of the contract clauses and concludes that the clauses have been violated, simply because the RSD has no plans to apply the CBAs in the schools that have been transferred to its jurisdiction. Because the plaintiffs have failed to plead specific facts alleging how and in what manner the CBAs have been impaired, we conclude that the trial court was correct in sustaining the State defendants' peremptory exception pleading the objection of no cause of action.
Furthermore, after review of this matter in light of the appropriate contract clause analysis, we conclude that application of Act 35 would violate neither the federal nor the state constitutional prohibitions against impairment of contractual obligations. Thus, we find that the grounds of the objection cannot be removed by amendment of the petition pursuant to LSA-C.C.P. art. 934, because the plaintiffs simply cannot state a cause of action for a violation of the state or federal contract clauses. Accordingly, the ruling of the trial court dismissing the plaintiffs' suit for failure to state a cause of action must be affirmed.

AMENDMENT OF PETITION
Plaintiffs also contend that the trial court erred in denying their motion for leave of court to amend the petition prior to considering the peremptory exceptions.[16] *199 Pursuant to LSA-C.C.P. art. 1151, once an answer has been filed, a plaintiff may amend his petition only by leave of court or with the consent of the adverse party. As plaintiffs did not have the consent of the State defendants,[17] they were required to obtain leave of court to amend the petition. Amendment of pleadings should be liberally allowed provided that the movant is acting in good faith, the amendment is not sought as a delaying tactic, the opponent will not be unduly prejudiced, and trial on the issues will not be unduly delayed. However, the decision as to whether to grant leave to amend or supplement a pleading is within the sound discretion of the trial court, and its ruling will not be disturbed on appeal except where an abuse of discretion has occurred and indicates a possibility of resulting injustice. Stockstill v. C.F. Industries, Inc., 94-2072 (La.App. 1st Cir.12/15/95), 665 So.2d 802, 810, writ denied, 96-0149 (La.3/15/96), 669 So.2d 428.
After a thorough review of the record, we find no abuse of discretion by the trial court in denying the plaintiffs' motion for leave of court to amend the petition. With the amendment, plaintiffs merely sought to dismiss certain causes of action without prejudice in an effort to prevent their dismissal with prejudice. The issues had been joined by the exceptions filed by the defendants, and plaintiffs' amendment was merely an attempt to reserve their rights to raise the issues again at a later date. Accordingly, we find this assignment of error to be without merit.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed to plaintiff, United Teachers of New Orleans.
AFFIRMED.
NOTES
[1] Plaintiffs filed a general appeal of all of the Issues addressed in the trial court's judgment; however, the peremptory exception pleading the objection of no cause of action is the primary issue raised on appeal.
[2] The number of schools affected by this legislation is not dear from the record. At one point, the parties indicated that 117 of the 128 schools in Orleans Parish were placed under the supervision of the RSD as a result of the new legislation; however, later in the litigation, the parties stated that "only" 99 schools were affected. Complicating the matter further is the fact that after the devastation caused by Hurricane Katrina, relatively few schools were opened in Orleans Parish due to the displacement of much of the population. In any event, it is undisputed that Act 35 affected a large percentage of Orleans Parish schools.
[3] Davis and Prier are identified in the petition as "citizen taxpayer[s] domiciled in the State of Louisiana," as well as domiciliaries of Jefferson Parish and Orleans Parish respectively. Gaudet is identified as a taxpayer, a domiciliary of Orleans Parish, and the parent of a school-age child enrolled in a New Orleans public school.
[4] According to the petition, the CBAs at issue were entered into on July 1, 2003, and were to expire by their terms on June 30, 2006.
[5] The State defendants also filed a dilatory exception pleading the objections of improper cumulation of actions and vagueness. These defendants subsequently filed a motion to set the exception raising the objections of no cause of action and no right of action for trial. With this motion, the State defendants withdrew the dilatory exception pleading the objection of vagueness and deferred hearing on the dilatory exception pleading the objection of improper cumulation of actions to a later date, but only in the event the trial court did not sustain the objections raised by the peremptory exception.
[6] Plaintiffs offered no opposition to the objection of no cause of action as it pertained to counts 2 and 3 of the petition, but did offer opposition with respect to count 1.
[7] Although the trial court had explicitly sustained OPSB's peremptory exception raising the objection of no cause of action at the hearing, and the minute entry of the hearing also noted the exception as being sustained, that exception was not mentioned in the judgment signed by the trial court. Plaintiffs appealed the trial court's oral ruling that sustained OPSB's exception; however, this issue is now moot, as plaintiffs filed a motion to dismiss OPSB from the appeal, with prejudice, prior to oral argument before this court. That motion was subsequently granted by this court.
[8] The statute further provided for the transfer to the RSD of railed schools for which the local school board had failed to present or implement an acceptable reconstitution plan.
[9] Subsection (C) of LSA-R.S. 17:10.6 was repealed by 2006 La. Acts, No. 687, § 1, effective June 29, 2006.
[10] LSA-R.S. 17:10.7(C)(1).
[11] We note that UTNO has referred to these statutory grants of authority as manifestations of the RSD's alleged status as a "successor employer" to the OPSB. In National Labor Relations Board v. Burns International Security Services, Inc., 406 U.S. 272, 277-79, 92 S.Ct. 1571, 1577, 32 L.Ed.2d 61 (1972), the court ruled that a new employer, succeeding to the business of another, had an obligation under the National Labor Relations Act (NLRA) to bargain with the union representing the predecessor's employees. According to UTNO, the RSD is a "successor employer" and is, therefore, required to bargain with the union. As noted above, UTNO acknowledged in its argument to the trial court that the RSD and OPSB are under no obligation to bargain. We further note that 29 U.S.C.A. § 158(a)(5) makes it an unfair business practice under the NLRA for an "employer" to refuse to bargain with the union. However, the state and its political subdivisions, such as OPSB and the RSD, are exempt from the definition of employer found in the NLRA. See 29 U.S.C.A. § 152(2); 29 U.S.C.A. § 142; 29 U.S.C.A. § 402. Since RSD is not an "employer" within the meaning of the NLRA, it cannot be a "successor employer."
[12] As all four elements of the analysis must be met to support a cause of action for a claim under the contract clauses, UTNO cannot state a cause of action for any violation of the state and federal contract clauses. See Segura, 630 So.2d at 729. Nevertheless, we will address the remaining elements of the analysis.
[13] Although we find no impairment of the CBAs, to the extent that any impairment of constitutional dimension could have been found, we note that it constitutes less than total destruction of UTNO's contractual expectations. Accordingly, as we assess the public purpose justifying the passage of Act 35, we emphasize that the judgment of the legislature is entitled to great deference. See Segura, 630 So.2d at 731.
[14] See Association of Surrogates and Supreme Court Reporters Within City of New York v. State of New York, 940 F.2d 766 (2nd Cir. 1991); Condell v. Bress, 983 F.2d 415 (2nd Cir. 1993); University of Hawaii Professional Assembly v. Cayetano, 183 F.3d 1096 (9th Cir. 1999).
[15] The preamble to Article VIII of the Louisiana Constitution of 1974 provides:

The goal of the public educational system is to provide learning environments and experiences, at all stages of human development, that are humane, just, and designed to promote excellence in order that every individual may be afforded an equal opportunity to develop to his full potential.
[16] This is distinguished from the trial court's obligation to allow amendment of the petition, if possible, pursuant to LSA-C.C.P. art. 934.
[17] It does not appear from the record that OPSB ever filed an answer. However, whether UTNO could amend the petition without leave of court as to OPSB only is not before us, as OPSB was dismissed from the appeal.